C5VKMEYC

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    STEVEN MEYER, et al.,

4                    Plaintiffs,

5            v.                            11 CV 6268 (ALC)

6    UNITED STATES TENNIS
     ASSOCIATION,
7
                    Defendant.
8
     ------------------------------x
9                                          New York, N.Y.
                                           May 31, 2012
10                                         4:07 p.m.

11   Before:

12                   HON. MICHAEL H. DOLINGER,

13                                         District Judge

14                          APPEARANCES

15   ABBEY SPANIER RODD & ABRAMS LLP
          Attorneys for Plaintiffs
16   ORIN KURTZ

17   AKIN GUMP STRAUSS HAUER & FELD LLP
          Attorneys for Defendant
18   NATHAN J. OLESON

19

20

21

22

23

24

25

C5VKMEYC

1                    (In open court; case called)

2                    THE COURT:  What is currently at issue?

3                    MR. KURTZ:  Good afternoon, your Honor.  Orin Kurtz

4     for the plaintiffs.

5                    We have a class certification motion due shortly.

6                    THE COURT:  When is it due?

7                    MR. KURTZ:  We currently have it as the later of

8     June 15th or two weeks after the resolution of the issues in

9     this conference.

10                   THE COURT:  OK.

11                   MR. KURTZ:  In connection with that anticipated

12    motion, there are several categories of documents that we have

13    requested from the defendant, United States Tennis Association,

14    and that the United States Tennis Association has refused to

15    produce, and we are seeking production of those documents.

16                   This is a case about failure to pay overtime.  It's a

17    class and collective action.  And there are documents that

18    would give an indication of what hours the members of the class

19    worked.  We, the plaintiffs, are seeking to compel production

20    of those hours, to be able to show how, by common proof, we

21    will flesh out the claims that the class worked more than 40

22    hours per week.

23                   Those documents include something called timecards,

24    which the USTA keeps, which show when matches begin and end,

25    and that will show when umpires were umpiring matches.  We

C5VKMEYC

1     have --

2              THE COURT:  Are these timecards reflective of or do

3     they identify specific umpires?

4              MR. KURTZ:  I don't believe they do, but I don't have

5     knowledge of that.  My opponent may know, but it's my

6     understanding they just show when -- we haven't seen any of

7     them.  It's my understanding that they would show when the

8     matches begin and end and not particular --

9              THE COURT:  That is a separate card for each match?

10             MR. KURTZ:  I don't know, your Honor.

11             THE COURT:  If you don't know that, can you explain to

12    me, assuming that to be the case, why it would be relevant, if

13    it just shows match A began at 10:30 and ended at 12:00?

14             MR. KURTZ:  Because there are also other documents

15    that tie in with that.  There are crew sheets which show which

16    umpires worked on which courts, and those, I believe, can be

17    synced up with the timecards that show when matches began and

18    ended.

19             These documents would also help us establish when

20    plays ended each day and when the umpires were at least close

21    to being released for the night, because at the end of the day,

22    when the matches end, the umpires are not free to just leave.

23    If you're working a match and it ends, they have to wait for

24    the chief umpire, who is an employee of the USTA, to give them

25    permission to leave.  And that occurs on various points, when

C5VKMEYC

1    they're not needed anymore, and that could be at the end of

2    play for the day, that could be at the end of their match, but

3    these timecards will show when the matches end and show --

4            THE COURT:  But it won't tell you when any individual

5    umpire was allowed to leave.  So I don't understand how this

6    becomes relevant to your proof of how long the umpires worked.

7    One umpire might have a match at, say, 10:30, finishes at

8    12:00, maybe he or she does another match at 2:00 to 4:00 and

9    that's the end of his day.  How are you going to know that, as

10   opposed to an umpire who works, let's say, a matching beginning

11   at 10:00 and ending at 12:00 and then has to stick around for a

12   match from 4:00 to 6:00 and then another from 7:30 to 9:30,

13   let's say?

14           MR. KURTZ:  I think, that syncing is with what crew

15   sheets we have will help us determine that.

16           THE COURT:  You mean the crew sheets will show who

17   worked and when?

18           MR. KURTZ:  Yes.

19           THE COURT:  OK, I can understand that.  But I don't

20   understand then the timecards.

21           MR. KURTZ:  Well, they don't give us a precise ending,

22   but they tell us which crew -- we will know to some degree

23   which crew was on which match, and then --

24           THE COURT:  That would be from the crew sheets?

25           MR. KURTZ:  That would be from the crew sheets, but

C5VKMEYC

1    those crew sheets don't have the time on them.

2             THE COURT:  Oh, I thought you just said it shows who

3    worked and when.

4             MR. KURTZ:  Who worked at which court and which match?

5             THE COURT:  OK.  And then the timecards would show how

6    long the matches went?

7             MR. KURTZ:  Yes.

8             THE COURT:  OK.  What else?

9             MR. KURTZ:  We're also seeking documents -- in order

10   to enter the U.S. Open grounds, it's our understanding that one

11   must swipe credentials.  And we have requested documents

12   showing when each umpire's credentials were swiped, which would

13   show when they entered the grounds and could potentially show

14   when they began working.

15            THE COURT:  Anything else?

16            MR. KURTZ:  We have also requested communications

17   between the USTA and the umpires concerning a discrete set of

18   issues, essentially disciplinary and time issues.  This case

19   centers on whether the umpires are independent contractors.

20            THE COURT:  There is a dispute about that?

21            MR. KURTZ:  There is a dispute about that.

22            And one of the factors is the control exercised over

23   the plaintiffs by the defendant.  And we would like the

24   communications between the USTA and any umpire that involved

25   discipline, control.  There's an Official's Code of Conduct.

C5VKMEYC

1    We'd like communications that show enforcement of the

2    Official's Code of Conduct.  We do understand that it was

3    pretty -- umpires could be terminated for issues such as

4    complaining to the cafeteria.  That's been some testimony we

5    received in this action.  There's a pretty extensive control,

6    in our opinion, and we'd like to see the communications between

7    USTA and the umpire that show that control.

8           Also, the USTA receives evaluations that are performed

9    by a certain people who are affiliated with the USTA.  These

10   evaluations are granular; they talk about the angle of

11   somebody's hand, of an umpire's hand, in making a call.

12   They're very detailed, and they show great control, and they

13   determine the assignments for the umpires on a daily basis.

14   And we have requested, and would like to receive, those

15   evaluations as well.

16          THE COURT:  And the time frame you're looking for?

17          MR. KURTZ:  We're looking for the class period of this

18   case, which is the U.S. Opens from the year 2005 to the

19   present.

20          THE COURT:  That is through 2011, I take it?

21          MR. KURTZ:  Through 2011, and it would be continuing

22   as the time moved forward.

23          THE COURT:  Any other items?

24          MR. KURTZ:  We're also seeking payroll information,

25   which is essentially just a record of how much each umpire was

C5VKMEYC

1    paid and which dates they worked.  The umpires are paid on a

2    daily basis, and that would again show at least the days that

3    the umpires work, if not the hours.  It will not show the hours

4    but it will show which days each umpire worked.

5          THE COURT:  And the relevance of that to the class

6    motion is what?

7          MR. KURTZ:  Is to, again, show how we can establish,

8    if not the precise hours worked, a general idea of hours worked

9    by common proof that's held by the USTA.

10         THE COURT:  How does the payroll information show you

11   the number of hours?

12         MR. KURTZ:  It shows the number of days worked.

13         THE COURT:  Well, what is the relevance of that to the

14   number of hours worked?

15         MR. KURTZ:  From there, we can go to the timecards, to

16   the crew sheets.

17         THE COURT:  The timecards will show you the

18   information about who worked on which days.  Isn't the payroll

19   information in that respect completely duplicative?  What other

20   information does it provide that's pertinent to the class

21   motion?

22         MR. KURTZ:  It gives us a more precise idea.  Both the

23   crew sheets and motion -- well, we don't know what the

24   timecards look like, but neither of them are -- those will take

25   sorting to really figure out who worked what days; whereas, if

C5VKMEYC

1    we have payroll records, we can see who worked what days, and

2    it's a much clearer analysis of when --

3            THE COURT:  Clearer than what?

4            MR. KURTZ:  Clearer than the crew sheets or what we

5    think the timecards will say.

6            THE COURT:  Well, if the payroll information is

7    clearer than the timecards and the crew sheets, why do you need

8    the timecards and the crew sheets?

9            MR. KURTZ:  Because we also have to prove how many

10   hours everybody worked.

11           THE COURT:  I thought that was your purpose supposedly

12   in getting the payroll records.  I don't understand what the

13   payroll records are supposed to show then.

14           MR. KURTZ:  Well, it's just my understanding that the

15   records here are not -- that there is no single record that's

16   going to give us what we need.

17           THE COURT:  Maybe so, but I'm still unclear as to what

18   it is that the payroll records give you that the timecards and

19   the crew sheets don't give you or vice versa.

20           MR. KURTZ:  The payroll just gives us a much clearer

21   idea of who worked.  I believe some payroll information was

22   attached to the defendants' letters, and it just indicates that

23   Aimee Johnson, one of our plaintiffs, Aimee Johnson worked the

24   following days, paid the following amount, and that's a very

25   concise record of what days she worked.

C5VKMEYC

1          THE COURT:  Anything else?

2          MR. KURTZ:  That's it, your Honor.

3          MR. OLESON:  Your Honor, Nathan Oleson for defendant

4    United States Tennis Association.

5          It probably makes against to go in reverse order,

6    starting with the payroll information.  As your Honor noted,

7    that doesn't actually show the hours worked, but we have also

8    already provided to the plaintiffs -- plaintiffs said we

9    haven't produced the documents.  That's not true.  We have

10   produced these documents.

11         THE COURT:  Which documents?

12         MR. OLESON:  These payroll documents.

13         THE COURT:  You've produced them already?

14         MR. OLESON:  For the named plaintiffs, your Honor.

15         And so, as we note in our letter, to the extent

16   plaintiffs believe that these are common evidence to show time

17   or what have you, they certainly don't need every single

18   payroll record ever created.  They can --

19         THE COURT:  Is your client prepared to stipulate that

20   the plaintiffs' records are representative of the records of

21   the entire class?

22         MR. OLESON:  Not -- maybe not in a legal sense, your

23   Honor, but certainly --

24         THE COURT:  In that case, the argument holds no

25   weight.  What's your next argument?

C5VKMEYC

1          MR. OLESON:  Maybe if I could, if the Court could

2     indulge me, we're prepared to stipulate that these records

3     exist for the other class members.

4          THE COURT:  So what?  What does that mean?  How does

5     that help adjudicate or advance the ball, in terms of the

6     question of the class, where the plaintiff has the burden of

7     proving not just numerosity but commonality and typicality?

8          MR. OLESON:  Correct, your Honor.

9          THE COURT:  I don't understand.  If your client is not

10    prepared to stipulate as to commonality and typicality, how you

11    can argue with a straight face that the plaintiffs ought to be

12    willing to be limited to their own personal records?

13         MR. OLESON:  Well, first of all, this is a

14    representative case where they are taking the position that

15    these class representatives can represent the absent class

16    members without any other individualized inquiry.  So,

17    certainly in a class action -- I've never seen a class action,

18    your Honor, where the plaintiff has come in and submitted to

19    the Court, as evidence of commonality, every single pay record

20    for every single employee that ever worked during that time

21    period.

22         THE COURT:  They may or may not, depending on the size

23    of the class, but they're certainly entitled to discovery

24    sufficient to demonstrate typicality, and in this case you seem

25    to be cutting off, or proposing that the Court should cut them

C5VKMEYC

```
1   off, with just a handful of records in response to which

2   undoubtedly your client will argue that they haven't shown

3   these elements required under Rule 23.

4           MR. OLESON:  Your Honor, we wouldn't argue that they

5   have not shown that there is common records that they could

6   point to, for instance, on --

7           THE COURT:  I don't understand this business about

8   common records.  The plaintiffs are not suing over the records.

9   The plaintiffs are suing on the contention that they have been

10  denied overtime.  To establish a basis for a class action, they

11  have to show not merely that they were denied overtime but that

12  sufficient numbers of others also were denied overtime.

13          MR. OLESON:  Correct, your Honor.

14          THE COURT:  So the fact that there are other records

15  somewhere which are not going to be produced, and they can say

16  they are records that have not been produced, doesn't advance

17  them one whit.

18          MR. OLESON:  The plaintiffs' burden, your Honor, is to

19  show there is common evidence available to prove those facts,

20  and having -- I think we attached as Exhibit 1 to our document

21  here -- certainly having these documents in Exhibit 1 and

22  saying they have these same documents for every other potential

23  class members shows that their argument will be, these

24  documents will be common to the class and we can look at these

25  common documents and make this determination.
```

C5VKMEYC

1          THE COURT:  Do you have another argument on this?

2          MR. OLESON:  Well, obviously, your Honor, the other

3     point is that these documents actually don't show any of the

4     hours that any of these individuals worked any particular day.

5          THE COURT:  These documents?  Let's be more precise.

6     Which documents?

7          MR. OLESON:  Sure.  The payroll documents.

8          THE COURT:  How about the timecards and the crew

9     sheets?

10          MR. OLESON:  The crew sheets?  We've, again, already

11     produced everything that we have as to those.

12          THE COURT:  Well, let's just be careful about this.

13     You say you produced the crew sheets for all members of the

14     class?

15          MR. OLESON:  All the crew sheets that we have, your

16     Honor.

17          THE COURT:  I'm sorry?

18          MR. OLESON:  All the crew sheets that we have, your

19     Honor.

20          THE COURT:  About how many members of the class?

21          MR. OLESON:  Every year there's about 300 or so

22     umpires.

23          THE COURT:  And some number of them, I take it, will

24     continue on from year to year?

25          MR. OLESON:  Correct.  But these are not

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

C5VKMEYC

```
1    individualized documents, not documents that are in a

2    particular individual's file.  Again, we have produced an

3    example of these, and they're basically a run of everybody that

4    umpired on a particular day at a particular court.  And so we

5    produced, I believe, more than a thousand pages of these

6    documents.  They only go back a couple years because we have

7    really no reason to keep them beyond that point.

8            THE COURT:  So they were kept for what period of time?

9            MR. OLESON:  I believe we -- it's in our papers, but I

10   believe 2011, 2010, and perhaps 2009, but maybe just 2010,

11   2011.

12           THE COURT:  I assume you have someone who can execute

13   a declaration specifying that the crew sheets for preceding

14   years have been destroyed routinely?

15           MR. OLESON:  Certainly, your Honor.

16           THE COURT:  What about the timecards?

17           MR. OLESON:  The timecards?  We actually don't keep

18   the data on timecards.  Plaintiffs referred to some testimony

19   from Richard Kaufman who's the head official.  During the

20   course of the tournament, what will happen is they have these

21   handheld devices that have this data on them that shows the

22   time of the match.  So at the end of the match, at the end of

23   the day, they release the length of the match to the press,

24   they make a printout of that, and they keep it at the

25   officials' office at the U.S. Open for that period of time.
```

C5VKMEYC

1      After the U.S. Open, there's no real reason to have

2  some of that information.  My understanding is, based on the

3  testimony of Mr. Kaufman, this data may be held by the

4  third-party entity that supplies these handheld devices, but we

5  don't have that data in any sort of usable form based on the

6  information I've been given, your Honor.

7      THE COURT:  So you're saying, even though there's a

8  hard copy produced, that's all tossed away?

9      MR. OLESON:  Correct, your Honor.  There is no real

10 reason after the tournament itself to retain these sort of

11 documents at this point.

12      We do have -- part of the issue here is that a number

13 of these issues were never really fully addressed on a

14 meet-and-confer.  We did go back and find a listing of document

15 called "Last Ball Struck," which is not the timecards

16 plaintiffs are asking for, but it says the time that the last

17 ball was struck on each court each night.  We're prepared to

18 offer those documents in lieu of the timecard documents, that

19 we really don't have.  And those wouldn't give the length of

20 any particular match but would show the time that the court

21 essentially shut down for the evening.  And since lineup cards

22 stay with the court, I guess that would be, again, the

23 plaintiffs' theory as to evidence of hours.

24      THE COURT:  When you say "stay with the court," what

25 does that mean?

C5VKMEYC

1          MR. OLESON:  There are some courts that are

2     exceptions, show courts where there are longer days.  But in a

3     typical court, say, one of the -- not Arthur Ashe, but some

4     other court, the line umpires will stay on that court for the

5     duration of the day, and when the day is over they will leave

6     the court and then at some point be released.

7          THE COURT:  Are there records reflecting when matches

8     begin on each court and when the last ball is struck?

9          MR. OLESON:  We have the last-ball-struck data -- or

10    they're not data, it's actually documents, I've seen them.  I

11    don't recall, your Honor, if there is any information on the

12    first ball struck in that document.  I can certainly go back

13    and check that.  But, generally speaking, the first matches of

14    the day -- and this is the testimony of the plaintiffs

15    themselves -- started at 11:00 a.m.  And so there would be at

16    least testimonial --

17         THE COURT:  Normally, would it be required, if an

18    umpire is assigned for work that day, that that umpire would

19    show up by no later than 11:00 at his or her assigned court?

20         MR. OLESON:  Actually, again, your Honor, there's

21    testimony it's actually 10:00 o'clock that they're expected to

22    be there and be available.

23         THE COURT:  So they're all supposed to be there by

24    10:00?

25         MR. OLESON:  Correct.

C5VKMEYC

1          THE COURT:  Let's say on a given court, matches go on

2     and off, and eventually the last match ends at, let's say,

3     5:00 o'clock, but there are matches going on on other courts.

4     Would the umpire on the court where the last match has ended be

5     expected to leave at that point or stay?  Or what's the --

6          MR. OLESON:  Again, generally speaking, their

7     testimony is, if it's a 5:00 o'clock end time, they would be at

8     that point released at some point.  Sometimes -- I believe

9     there's testimony as to this -- that sometimes they may be

10    required to move to another court.  But that's the type of

11    information that would be shown on these timecards, for

12    instance, or the "Last Ball Struck."  Perhaps -- I'm not even

13    sure if they would show on the crew sheets because it would be

14    an ad hoc assignment, if a match was running particularly late

15    and they wanted to leave and umpire and crew on another court,

16    for instance, but those are ad hoc situations that I don't

17    think any of these documents would cover.

18         THE COURT:  And people were paid on, what, a per diem

19    basis or an hourly basis?  How was that?

20         MR. OLESON:  Daily basis, your Honor.

21         Going back to the credentials, too, because they are

22    related to this as well, the credential information, the swipe

23    information, that plaintiffs are seeking, again, doesn't

24    actually show hours worked.  What happens is, umpires have the

25    opportunity to take buses to the U.S. Open earlier in the day,

C5VKMEYC

1    they can arrive early, they have a per diem in addition to

2    their daily rate, they can have breakfast, they can play cards

3    in the umpires' lounge -- they're not required to report until

4    10:00 -- but some show up earlier.  And when they walk through

5    the gate, that's when they would swipe their credential.  So

6    the credentials themselves, the credential itself, based on the

7    testimony of the plaintiffs themselves, would not have to show

8    when they began to work.  It would simply show when they

9    entered the grounds of the facility.

10          Our position on that is that, I think, similar to some

11   of the questions directed to counsel, it simply does not show

12   the actual hours being worked.

13          THE COURT:  I take it there would be no dispute that

14   there is an across-the-board requirement that they all show up

15   by 10:00 a.m.?

16          MR. OLESON:  Correct, your Honor.  Yes, there's one

17   wrinkle to this, but I don't think it makes any difference:

18   Sometimes they have what's called a night crew that will come

19   in at, I believe it's 3:00 o'clock or 2:00 o'clock, but, again,

20   report time for the night crew would be established in the

21   record as the common expectation.

22          I believe that we have covered the timecards, crew

23   sheets, credentials.

24          The evaluations, again, we produced the evaluations

25   for the named plaintiffs.  The evaluation form is the same for

C5VKMEYC

1    every individual who gets these sorts of evaluations at the

2    Open.  And, again, our position is that because the information

3    is the same in the form, it simply adds nothing and, in fact,

4    it's actually contrary to plaintiffs' contention that this can

5    be resolved with the representative evidence of the named

6    plaintiffs, that these -- that they need every single

7    evaluation ever conducted of anybody at the Open when the

8    questions in the criteria will be the same on each evaluation.

9    And, again, we have attached those documents at Exhibit 4 of

10   our submission.

11          And then finally, the communications -- I guess I

12   skipped around more than I said I would -- the communications

13   as to certain discipline, again, our position on is that is, we

14   produced everything that that would have related to the named

15   plaintiffs or would have been sent to umpires generally.  The

16   idea that the discipline of other people may be relevant to the

17   named plaintiffs' claims and the -- if the named plaintiffs'

18   claims are truly representative, these individualized issues,

19   which would require the testimony of other witnesses is simply

20   not relevant.

21          THE COURT:  But again, you're assuming then that the

22   plaintiffs will be able, without the documents, to prove that

23   the named plaintiffs' disciplinary issues will be

24   representative of everyone else.  How are they going to prove

25   that without the documents?  Unless your client is willing to

C5VKMEYC

 1   stipulate to that?

 2            MR. OLESON:  That the named plaintiffs are

 3   representative?

 4            THE COURT:  Yes.

 5            MR. OLESON:  No --

 6            THE COURT:  Either you stipulate to it or you produce

 7   the documents that would be necessary for the plaintiff to

 8   prove the fact.  You can't have it any third way.

 9            MR. OLESON:  We're obviously not willing to stipulate

10   to the legal issue of representativeness on that.

11            THE COURT:  OK.

12            MR. OLESON:  And I believe I've addressed each of the

13   issues that were raised by your Honor.  If I've not, please let

14   me know.

15            THE COURT:  What's the story with regard to

16   communications, not specifically about discipline, if there is

17   a distinction, but with regard to the enforcement of the

18   so-called Official's Code of Conduct?

19            MR. OLESON:  Are you asking me, your Honor?

20            THE COURT:  Yes.  There is an Official's Code of

21   Conduct?

22            MR. OLESON:  There is an Official's Code of Conduct.

23   I'm not aware of any -- first of all, I'm not aware of any

24   emails, standing here today, that relate to that beyond just

25   the general issuance of the Official's Code of Conduct within

C5VKMEYC

1    certain communications but --

2            THE COURT:  Has the client determined whether there

3    are such?

4            MR. OLESON:  I'd have to check on that.

5            THE COURT:  I take it there's no articulable basis for

6    declining to turn that over --

7            MR. OLESON:  Well, I think on that issue, our position

8    on that issue --

9            THE COURT:  Excuse me.

10           -- if there is an open issue as to control?

11           MR. OLESON:  Our position on that is the same as it

12    was for the disciplinary issues, which I understand you've

13    rejected.

14           THE COURT:  I'm not sure if I have rejected anything,

15    as we speak.  I'm simply trying to understand the logic behind

16    the argument.  That's all.

17           MR. OLESON:  Certainly.

18           THE COURT:  OK.

19           Let me also just raise one question.  In your

20    correspondence with the Court, you alluded to a matter of

21    burden but indicated that you weren't necessarily sure of the

22    degree of burden and sort of left it open.

23           Normally, it is the burden, shall we say, of the party

24    claiming burden, to show the burden and to show it by competent

25    evidence.  I take it that's not something you would intend to

C5VKMEYC

1    do up to now?

2            MR. OLESON:  We have, your Honor.  Obviously, we were

3    requested to respond on a fairly quick time frame, so we are

4    aware generally of this burden, but we want to go back and put

5    some more -- we're happy to submit a declaration on this issue.

6            THE COURT:  You're happy to do what?

7            MR. OLESON:  Submit a declaration to articulate this.

8    But at the time, simply the witnesses weren't available, we

9    only had a couple days to respond, but the burden is it related

10   to the credentials, the swipes --

11           THE COURT:  The swipe?

12           MR. OLESON:  -- at the beginning of the day, again,

13   that only happens at the beginning of the day, these credential

14   swipes are not kept in a database where there is a nice neat

15   swipe credential number, name, and time associated with it;

16   they're kind separately taken.  So you have to go in manually

17   with each name, first find the credential numbers that apply to

18   that name for each year, and then run each credential number

19   through the database individually to find each credential swipe

20   for each particular year.

21           So the estimate is that it would take several weeks

22   for the USTA to pull this information together.

23           THE COURT:  Let me ask you one other thing with regard

24   to timecards, where you said the information that would be

25   reflected on timecards is contained in some database --

C5VKMEYC

| 1 | MR. OLESON:  There's a handheld device which, again,

| 2 | my understanding, is supplied by a third party -- I'm not sure

| 3 | if it's NCR or what have you -- and that data may be available

| 4 | on that database, and that company may hold that data, but the

| 5 | USTA itself does not keep that data.

| 6 | THE COURT:  Who handles the devices in the

| 7 | tournaments?

| 8 | MR. OLESON:  The chair umpires who are members of the

| 9 | class.

| 10 | THE COURT:  And then they return the device at the end

| 11 | of the tournament; is that how it works?

| 12 | MR. OLESON:  Yes, your Honor, that's my understanding.

| 13 | THE COURT:  Let me just run through my notes to make

| 14 | sure that we have covered everything.

| 15 | What's in the payroll records, by the way?

| 16 | MR. OLESON:  It just simply says the number of days

| 17 | worked over the course of the entire tournament.  And then it

| 18 | says whether it's during the qualifier or the main draw of the

| 19 | event, and then the total amount paid, both per day and

| 20 | overall.  And, again, that's Exhibit 1 to our submission.

| 21 | THE COURT:  OK.

| 22 | Anything else?

| 23 | MR. KURTZ:  Your Honor, with regard to the timecards,

| 24 | I believe that if that timecard information is held by some

| 25 | company that the USTA works with or contracts with, that could

C5VKMEYC

1   be considered within the USTA' possession, custody or control.

2          THE COURT:  Not really, but you can get the

3   information from the USTA as to which company it is and seek to

4   subpoena whatever information they have.  It does sound, given

5   the nature of the data, that it is highly likely that it's no

6   longer around.  But that's up to you.  You can seek to subpoena

7   it.

8          MR. KURTZ:  Thank you.

9          And regarding the evaluations --

10          THE COURT:  How many plaintiffs are there?

11          MR. KURTZ:  There are four named plaintiffs.

12          THE COURT:  For how many years did each of them work?

13          MR. KURTZ:  Of the six years that are going in this

14   case, I believe each of them missed about one year, so each of

15   them worked about five years.

16          I have nothing further for the Court.

17          THE COURT:  OK.

18          Let me run through this item by item.  Defendant says

19   that it doesn't have any timecards.  It's to provide a

20   declaration by someone with personal knowledge attesting to

21   that fact.

22          With regard to crew sheets, it appears to acknowledge

23   that it has crew sheets at least for 2010 and 2011.  Those are

24   to be produced.  There is a question as to whether it has them

25   for 2009.  If it does, then those are to be produced as well.

C5VKMEYC

1    If it says that it has none earlier than those years, it is to

2    provide a declaration by someone with personal knowledge

3    describing the facts pertinent to the disposition of those

4    documents by the defendant.

5         Given what's been discussed up to now, and in the

6    absence of any testimony that would call into question what

7    defendant has represented regarding the swipe data, I am not

8    going to direct that that be produced.

9         With respect to communications of various sorts

10   between the defendant and the umpires, initially, since there

11   is not a claim of burden here, I will direct that they turn

12   over communications that involve any disciplinary actions taken

13   with regard to umpires and any communications regarding the

14   Official's Code of Conduct.  That includes any general

15   communication sent to everybody and specific communications, if

16   there are such.

17        Have the evaluations of the four plaintiffs been

18   turned over already?

19        MR. OLESON:  Yes, your Honor.  And I would note for

20   the record also, we have already produced back in February

21   those 2010-2011 crew sheets.

22        THE COURT:  OK.

23        MR. OLESON:  And the general communications that you

24   just referenced as the code of conduct.

25        THE COURT:  Very well.

C5VKMEYC

1    I am not going to order additional evaluation forms at

2    this time.  If there is a showing of need for it, then I'll

3    consider it, but for the moment, to the extent that they may be

4    pertinent on the question of control, it seems to me that there

5    is reason to infer that the evaluations of the four plaintiffs

6    will be sufficient at least to show the nature of the

7    evaluation that presumably USTA uses with regard to all of the

8    umpires.  There, I don't see the problem that would command the

9    need for additional production.

10    Let me just make sure I haven't missed something, but

11    I think that's -- oh, yes, there are one or two other things.

12    Defendant has indicated it would be willing to produce

13    the so-called "Last Ball Struck" documents.  They are to be

14    produced.  If there are any documents that would reflect the

15    comparable beginning of matches, then those are to be produced,

16    although, as I understand it, there seems to be a common

17    understanding that the umpires were supposed to show up by

18    10:00 o'clock except for the late shift people.

19    If it turns out that there are any other subcategories

20    of umpires, that is, umpires who for some reason might have

21    been required to show up earlier, then any such documents

22    relating to them are to be produced, but if that is a

23    nonexistent category, then be so it be, there won't be any such

24    documents, I assume.

25    Anything else at this point, other than setting a date

C5VKMEYC

```
 1    for this --
 2              MR. KURTZ:  Your Honor, with regard to evaluations, if
 3    none other than the named plaintiffs' evaluations are produced,
 4    can there be a declaration stating that for some category,
 5    whatever is accurate, that for some category of umpires who
 6    received evaluations, it's done on the same form or in the same
 7    manner?  I can discuss it with opposing counsel --
 8              THE COURT:  I think you can probably get some sort of
 9    agreement with the other side on that.  If there's a problem
10    let me know, sure.
11              Anything else at this point?
12              MR. OLESON:  No, your Honor.
13              THE COURT:  OK.  Can you get this all done in, say, a
14    week?
15              MR. OLESON:  Your Honor, I would like to consult with
16    my client just to make sure.  Is it possible to call your
17    chambers tomorrow or call opposing counsel with a proposed
18    date?
19              THE COURT:  Talk to opposing counsel and send me
20    something by fax tomorrow.  OK?
21              MR. OLESON:  Certainly, your Honor.
22              THE COURT:  Thank you.
23              MR. OLESON:  Thank you, your Honor.
24              MR. KURTZ:  Thank you, your Honor.
25                              * * *
```