**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN MEYER, MARC BELL, LARRY MULLIGAN-GIBBS and AIMEE JOHNSON, on behalf of themselves and all other similarly situated, <br><br>                 Plaintiffs, <br><br>        v. <br><br> UNITED STATES TENNIS ASSOCIATION, <br><br>                 Defendant. | Civ. Action No. 11-CV-6268(ALC) |

**DEFENDANT UNITED STATES TENNIS ASSOCIATION'S OPPOSITION TO PLAINTIFFS' MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

Richard J. Rabin
Kelly L. Brown
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
rrabin@akingump.com
kbrown@akingump.com

Nathan J. Oleson
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
noleson@akingump.com

ATTORNEYS FOR DEFENDANT
UNITED STATES TENNIS ASSOCIATION

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................1

FACTUAL BACKGROUND ....................................................................................3
      I.      PLAINTIFFS AND THEIR BUSINESS AS TENNIS UMPIRES ...................3

II.     TENNIS UMPIRES AT THE US OPEN...........................................................6
      A.     Officiating Matches at the US Open....................................................6
      B.     Umpires' Expenses and Compensation at the US Open........................9

ARGUMENT.........................................................................................................10
      I.     PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF
           RULE 23(A)............................................................................................11
      A.     Plaintiffs' Claims Are Not Subject to Common Proof. ..........................11

      B.     The Named Plaintiffs Are Not Typical of the Class. ...........................16

II.     PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE
     23(b)(3).....................................................................................................18
      A.     Common Questions Do Not Predominate. ............................................18
      B.     A Class Action Is Not Superior to Other Available Methods of
Adjudicating Plaintiffs' Claims. .........................................................................24

CONCLUSION ....................................................................................................25

Defendant United States Tennis Association ("USTA"), by and through its undersigned counsel, hereby files its opposition to Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel (the "Motion").  Plaintiffs' motion should be denied for the reasons set forth in this memorandum of law.

## PRELIMINARY STATEMENT

Plaintiffs have asked this Court to certify an international class of tennis umpires seeking overtime compensation for officiating matches at the US Open.  Plaintiffs' request should be denied because they have not met their burden to prove, by a preponderance of the evidence, that this case meets the class certification requirements of Fed. R. Civ. P. 23(a) and 23(b).

*First*, plaintiffs have not met the commonality prerequisite of Fed. R. Civ. P. 23(a). Plaintiffs allege that they are all employees rather than independent contractors, but a determination on the merits of plaintiffs' claim necessarily requires an individualized analysis. The legal inquiry required under plaintiffs' misclassification theories depends upon factual issues that differ from umpire to umpire.  Thus, the record shows that the individuals within the putative class perform different duties; are subject to different certification requirements; are evaluated differently; vary in their tax reporting status; and differ in the extent to which they claim they are purportedly controlled by the USTA.  These facts all may bear upon the independent contractor analysis, and no jury could possibly conclude that *all* umpires are employees when each of these factors may vary from class member to class member.

*Second*, for all of the same reasons they cannot meet the commonality requirement of Fed. R. Civ. P. 23(a), plaintiffs cannot demonstrate that the named representatives are typical of the class.  The putative class differs with respect to their duties, umpiring schedules, tax filing status, evaluation history, and relationship with the USTA.  Because the individual circumstances

1

of each plaintiff markedly differ, plaintiffs' claims are not typical of the class, and thus plaintiffs also have failed in their obligation to show typicality by a preponderance of the evidence.

*Third*, plaintiffs are not adequate representatives of the putative class.  Although plaintiffs contend that they do not provide their services as independent contractors, this position will indisputably harm a substantial portion of the putative class that believes they *do* provide services as independent contractors and have reported their income and expenses as such. Because the effect of a class action would be to take away the ability of these independent contractors to continue to claim this tax-advantaged status, an intractable conflict exists between the named plaintiffs and an unknown number of putative class members that they purport to represent.

*Fourth,* even assuming plaintiffs could meet the commonality requirement of Fed. R. Civ. P. 23(a), they cannot meet the more exacting predominance standard of Fed. R. Civ. P. 23(b). This provision requires that common, not individual, proof predominate at trial.  As noted below, the fact-intensive, multi-factor inquiry that the court must undertake to determine whether an umpire is appropriately classified as an independent contractor will depend in substantial part on individualized proof.  Similarly, plaintiffs have not shown how they can establish a *prima facie* showing that the New York Labor Law has been violated for each plaintiff because they offer no method of proof that can establish each class member worked more than 40 hours in a particular workweek during the two-and-a-half-week event.  Because these critical questions cannot be resolved predominantly through common evidence, plaintiffs may not maintain this case as a class action.

*Finally*, plaintiffs have not shown that a class action is a superior method to adjudicate their claims in light of the multitude of individualized issues that apply to their claims.  The

bringing of individual suits is no less efficient, and indeed more appropriate, than the adjudication of claims, such as those here, that would require a large number of mini-trials. Plaintiffs' motion for class certification accordingly must be denied.

## FACTUAL BACKGROUND

### I.   PLAINTIFFS AND THEIR BUSINESS AS TENNIS UMPIRES

Plaintiffs Steven Meyer, Marc Bell, Aimee Johnson and Larry Mulligan-Gibbs are lawyers, executives, or business managers (Oleson Decl., Ex. 1 (Meyer Tr.) at 14:18-16:21; Oleson Decl., Ex. 2 (Johnson Tr.) at 16:4-8; Oleson Decl., Ex. 3 (Bell Tr.) at 15:4-17:7; Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 20:8-22:11) who also serve as umpires, officiating professional tennis matches for various tennis associations, including the Association of Tennis Professionals ("ATP"), Women's Tennis Association ("WTA"), International Tennis Federation ("ITF"), and various national tennis associations and collegiate bodies.  (*See* Declaration of Nathan J. Oleson ("Oleson Decl.,"), attached as Ex. 1 at 173:2-175:21  Oleson Decl., Ex. 1 (Meyer Tr.); Oleson Decl., Ex. 2 (Johnson Tr.) at 108:2-115:21; Oleson Decl., Ex. 2 (Johnson Tr.); Oleson Decl., Ex. 3 (Bell Tr.) at 102:24-104:17, 266:9-12; Oleson Decl., Ex. 3 (Bell Tr.); Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 40:17-45:13; Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.).)

As tennis umpires, plaintiffs determine the tournaments to which they will apply to officiate each year.  (*See* Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 152:12-153:6, Oleson Decl., Ex. 3 (Bell Tr.) at 275:23-276:8.)  The number of tennis events they officiate may vary significantly; plaintiffs may officiate at several tennis events each year or umpire matches only sporadically.  (Oleson Decl., Ex. 2 (Johnson Tr.) at 108:2-115:21; Oleson Decl., Ex. 1 (Meyer Tr.) at 29:10-13; Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 46:19-25.)  Although some umpires

purport to work at their craft full-time, tennis umpires generally do not make their living with the income they earn umpiring matches.  (*See* Oleson Decl., Ex. 1 (Meyer Tr.) at 89:19-90:20; Oleson Decl., Ex. 2 (Johnson Tr.) at 115:8-14, 118:20-119:6, Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 143:11-22.

     Tennis umpires may fulfill a variety of roles when officiating at tennis tournaments.  At larger events, like the US Open, officials may serve as chair or line umpires.  (*Id.*)  Line umpires make line calls and monitor player compliance with the rules of tennis, which they may report to the chair umpire.  (*Id.* at 39:5-12.)  Line umpires' calls on "questions of fact," such as whether a ball is in or out, cannot be overturned except by the chair umpire.  (*Id.* at 42:16-43:13.)  Chair umpires, by contrast, are in charge of the entire match.  (Oleson Decl., Ex. 1 (Meyer Tr.) at 41:12-42:11.)  They monitor all aspects of the match and have the authority to overrule calls made by line umpires.  (*Id.* at 39:13-17, Oleson Decl., Ex. 1 (Meyer Tr.) at 179:12-16; 185:13-22.)  Their decisions on these "questions of fact" are final and cannot be reviewed.  (Oleson Decl., Ex. 2 (Johnson Tr.) at 43:7-44:13.)  Chair umpires also decide all "questions of law" during a match, including whether a player should be penalized for various conduct, and determine issues such as whether a match should be called because of weather.  (*Id.* at 43:25-45:2.)

     Umpires may obtain a variety of certifications as tennis officials that affect their status to officiate certain tennis tournaments and the compensation they are offered at these tournaments.  (Oleson Decl., Ex. 2 (Johnson Tr.) at 72:12-87:7.)  The USTA certifies officials as provisional, sectional, national, USTA, and professional.  (*Id.*)  Provisional umpires are required to undergo a written test and meet certain visual acuity requirements.  (*Id.*)  Subsequent certification levels may be obtained by officiating a certain number of matches or taking additional classes or

4

certification tests.  (*Id.*)  Other countries have different certification requirements for their tennis

officials.  (*See*, *e.g.*, Oleson Decl., Ex. 5 (Kaufman Tr.) at 60:15-61:5.)  In addition to these

certifications, umpires may pursue certification from other sanctioning bodies.  (Oleson Decl.,

Ex. 1 (Meyer Tr.) at 30:24-31:3, Oleson Decl., Ex. 2 (Johnson Tr.) at 72:12-87:7.)  For example,

tennis umpires may obtain white, bronze, silver, and gold "badges" from the ITF after attending

special training sessions sponsored by the Federation.  (*Id.*; *see also* Oleson Decl., Ex. 5

(Kaufman Tr.) at 50:14-51:19.)

Tennis umpires decide which tennis events to officiate based on factors such as the

prestige and location of the event, the compensation offered, and their personal and professional

schedules.  (*See, e.g.,* Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 152:12-153:6.)  The umpires

sign individual independent contractor agreements for each event and bear most of their

expenses related to the tournament, including travel, meals, and uniforms.  (Oleson Decl., Ex. 2

(Johnson Tr.) at 233:21-234:3; Oleson Decl., Exs. 18-20; Oleson Decl., Ex. 3 (Bell Tr.) at 277:5-

278:14; Oleson Decl., Exs. 21-22; Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 133:5-134:6,

169:4-14, 174:4-24, 186:22; Oleson Decl., Exs. 30-31; Oleson Decl., Ex. 1 (Meyer Tr.) at

165:23-167:111.)  Umpires also incur a wide variety of other expenses at their own discretion,

including the costs of insurance, professional association dues, office supplies, and equipment

such as stopwatches and tape measures.  (Oleson Decl., Ex. 2 (Johnson Tr.) at 226:3-229:20;

Oleson Decl., Ex. 1 (Meyer Tr.) at 148:23-152:9; Oleson Decl., Ex. 3 (Bell Tr.) at 267:22-269:5,

285:16-286:9; Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 182:4-184:3.)

Many tennis umpires represent in their tax returns that they are independent contractors,

and some of those individuals file schedules setting forth their profits and losses in connection

with umpiring.  (*See* Oleson Decl., Exs. 15-17; Oleson Decl., Exs. 32-33; Oleson Decl., Exs. 23-

27, Oleson Decl., Ex 3 (Bell Tr.) at 270:8-274:10.)  Other umpires do not claim independent

contractor status for some or all of their work as tennis umpires.  (Oleson Decl., Ex. 1 (Meyer

Tr.) at 168:7-169:7.)  Individual umpires' profit or loss from their tennis umpiring work may vary

substantially.  Johnson, for example, recognized a profit only once during the period from 2005

through 2011.  (Oleson Decl., Ex. 2 (Johnson Tr.). at 244:21-245:15.)  Bell, in contrast, made a

profit of several thousand dollars as a tennis umpire during the same period.  (Oleson Decl., Ex.

3 (Bell Tr.) at 270:8-274:10.)  Several factors affect umpires' profit or loss, including the number

and type of events they worked each year, their own personal expenditures, and the

compensation they could demand based on their certification level or badge status.  (*See, e.g.,*

Oleson Decl., Ex. 2 (Johnson Tr.) at 245:16-24; Oleson Decl., Exs. 12-14; Oleson Decl., Ex. 3

(Bell Tr.) at 275:23-276:8; Oleson Decl., Exs. 23-27;; Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.)

at 55:17-21; Oleson Decl., Exs. 28-29, 32-33; Oleson Decl., Exs. 20-22; Oleson Decl., Ex. 1

(Meyer Tr.) at 144:18-163:14; Oleson Decl., Ex. 9.)

## II.     TENNIS UMPIRES AT THE US OPEN

### A.     Officiating Matches at the US Open

The US Open is the USTA's signature event and one of the four "Grand Slam"

tournaments.  (*See generally* Dkt. No. 1, ¶ 2.)  The USTA retains umpires to officiate the Open

from a variety of sources. Some umpires are residents of the United States and certified by the

USTA at the provisional level or above.  (*Id.* at Oleson Decl., Ex. 5 (Kaufman Tr.) at 45:2-47:3.)

Other umpires are supplied by the national tennis associations of other countries, and have little

or no work history in the United States.  (*Id.* at 60:6-61:5, 113:7-114:19.)  Still other umpires are

supplied by the ATP or ITF under agreements between these federations and the USTA. (*Id.* at

205:19-206:23.)

6

USTA-certified officials may submit applications to work the tournament.  (Oleson Decl., Ex. 5 (Kaufman Tr.) at 130:2-131:2.)  In their applications, umpires identify the weeks they are willing to make themselves available to officiate matches.  (*Id.*; *see also, e.g.,* Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 68:20-73:12.)  Some USTA-certified officials may only officiate matches for the four days of "qualifying" matches played during the first week of the Open. (Oleson Decl., Ex. 1 (Meyer Tr.) at 95:17-96:4.)  Other officials work through the entire "main draw" until the end of the tournament.  (Oleson Decl., Ex. 5 (Kaufman Tr.) at 145:17-25.) Umpires also may identify certain days on which they will not work for personal or other reasons.  (Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 68:20-73:12.)  The four named plaintiffs applied to officiate at many of the US Opens during the relevant period, but some of them chose not to apply to officiate during certain years for personal or professional reasons.  (*See, e.g.,* Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 60:13-61:2; Oleson Decl., Ex. 1 (Meyer Tr.) at 32:18-33:23.)

Umpires' roles vary while at the US Open.  Some umpires may serve primarily as line umpires.  (*See, e.g.*, Oleson Decl., Ex. 1 (Meyer Tr.) at 40:8-17, 89:6-11.)  Line umpires at the US Open officiate in a variety of configurations on a "one-hour-on, one-hour-off" schedule at a specified court for all or part of the day.  (*Id.* at 99:7-21.)  Other umpires may serve exclusively as chair umpires.  (S*ee, e.g.*, Oleson Decl., Ex. 3 (Bell Tr.) at 135:15-136:15.)  Chair umpires at the US Open exercise additional authority beyond that of the line umpires, evaluate line umpires' performance, and work specific matches rather than on a one-hour-on, one-hour-off schedule. (*Id.* at 115:22-119:5.)  Other umpires serve in both roles to varying degrees throughout the tournament.  (*See, e.g.*, Oleson Decl., Ex. 2 (Johnson Tr.) at 160:5-160:10.)

During the course of the US Open, some umpires are evaluated by the USTA and other organizations.  (Oleson Decl., Ex. 5 (Kaufman Tr.) at 195:8-196:4.)  These evaluations may be conducted for a variety of reasons—to assess the umpires' skill for purposes of selecting umpires for subsequent matches, to fulfill certain certification requirements not related to the US Open itself, or to assist umpires in obtaining certifications from other sanctioning bodies such as the ATP or ITF.  (Oleson Decl., Ex. 2 (Johnson Tr.) at 182:25-183:25, Oleson Decl., Ex. 3 (Bell Tr.) at 69:21-71:14, Oleson Decl., Ex. 5 (Kaufman Tr.) at 70:24-71:5, 99:14-103:4.)  Evaluations may be conducted by certified evaluators or by individuals who are serving as chair umpires.  (Oleson Decl., Ex. 3 (Bell Tr.) at 118:20-121:16, Oleson Decl., Ex. 5 (Kaufman Tr.) at 100:8-16, 106:7-13.)  The frequency and extent to which these evaluations are conducted varies substantially.  Inexperienced USTA-certified chair umpires working qualifying matches may be subject to several evaluations.  (Kaufman Tr. at 99:2-19.)  By contrast, ITF silver- and gold-badged umpires generally are not evaluated by the USTA at all.  (*Id*. at 99:14-100:3.)  Line umpires may be evaluated by the USTA or by chair umpires.  (*Id*. at 100:5-16.)

In addition to these variations, individual umpires differ in the amount of time they spend on court each day officiating matches.  Umpires may arrive at the National Tennis Center at different times, begin officiating matches at various points in the day, and differ in terms of the number and length of the breaks they take.  (*See* Oleson Decl., Ex. 1 (Meyer Tr.) at 96:5-101:15, Oleson Decl., Ex. 2 (Johnson Tr.) at 147:2-153:14, Oleson Decl., Ex. 3 (Bell Tr.) at 139:17-140:11, Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 219:13-222:14.)  The time at which umpires depart the National Tennis Center also may vary substantially from day-to-day.  (*See* Oleson Decl., Ex. 2 (Johnson Tr.) at 153:3-154:19.)  During the time umpires are on the grounds of the National Tennis Center, the actual amount of time they spend officiating matches varies

8

considerably based on factors such as the length of the matches the umpires officiate, the length of other matches that impact the umpires' schedules, weather delays, and decisions by the USTA as to when individual umpires or groups of umpires will no longer be needed for matches for the day.  (*See* Oleson Decl., Ex. 1 (Meyer Tr.) at 102:15-22, Oleson Decl., Ex. 2 (Johnson Tr.) at 105:8-106:5, Oleson Decl., Ex. 5 (Kaufman Tr.) at 126:9-19.)

### B.   Umpires' Expenses and Compensation at the US Open

Most umpires retained to work the US Open sign agreements with the USTA in which they agree to provide their services as independent contractors.  (*See, e.g.,* Oleson Decl., Ex. 1 (Meyer Tr.) at 193:7-197:5; Oleson Decl., Exs. 7-8.)  Plaintiffs' compensation under these agreements varies from $115 per day to $200 per day depending upon plaintiffs' certification level.  (*See, e.g.,* Oleson Decl., Ex. 5 (Kaufman Tr.) at 150:10-151:11.)  Although the language of these agreements is largely the same, plaintiffs claim to have different understandings as to the meaning of the agreement.  Johnson, for example, claimed that – despite being an attorney – she did not read the agreement thoroughly and did not believe she was bound by any language in the agreement as to her independent contractor status.  (Oleson Decl., Ex. 2 (Johnson Tr.) at 201:4-202:11.)  Mulligan-Gibbs, by contrast, admitted that he understood when he signed the agreement that he was agreeing to work as an independent contractor.  (Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 129:14-130:21.)

Pursuant to these agreements, the USTA pays some travel and meal costs for umpires at the US Open.  (Oleson Decl., Ex. 1 (Meyer Tr.) at 73:2-13, Oleson Decl., Ex. 3 (Bell Tr.) at 136:22-139:4, Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 118:11-13.)  However, umpires can (and do) incur a variety of additional expenses that are not reimbursed.  (*See, e.g.,* Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 169:4-171:10; Oleson Decl., Ex. 1 (Meyer Tr.) at 70:10-72:25.)

For example, umpires pay additional meal expenses not covered by their $20-25 daily stipend, can spend extra to obtain their own single room at the InterContinental or Sheraton Midtown, and cover local travel expenses to and from the airport and whenever they take alternate transportation, such as the subway, to the tournament.  (*Id.*)  Umpires also pay for their own eyewear, sunblock, and other necessary equipment beyond their tournament uniforms.  (Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 174:8-175:10.)  The extent to which umpires incur these expenses varies from individual to individual.  (Oleson Decl., Ex. 2 (Johnson Tr.) at 225:2-227:21; Oleson Decl., Ex. 1 (Meyer Tr.) at 151:11-152:9; Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 173:2-175:22; Oleson Decl., Ex. 3 (Bell Tr.) at 267:10-268:20.)

## ARGUMENT

Class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979).  The availability of class procedures are governed by Rule 23(a) and (b) of the Federal Rules of Civil Procedure.  Rule 23(a) requires that plaintiffs establish that (1) the putative class is so numerous as to make joinder impractical, (2) there are questions of law or fact common to the class, (3) the claims and defenses of the representative parties are typical of the class, and (4) the representative plaintiffs will fairly and adequately protect the interests of the class.  Fed. R. Civ. P. 23(a)(1)-(4).  In this case, plaintiffs also must satisfy the requirements of Rule 23(b)(3), which demand that plaintiffs establish that questions of law or fact common to class members "predominate over any questions affecting only individual members, and that a class action is superior to other methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).

"Rule 23 does not set forth a mere pleading standard.  A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are *in fact* sufficiently numerous parties, common questions of law or fact, etc." *Wal-Mart Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011).  Plaintiffs accordingly bear the burden of demonstrating, by a preponderance of the evidence, that they have met all four requirements of Rule 23(a) and at least one of the requirements of Rule 23(b).  *In re Initial Pub. Offerings Secs. Litig.*, 471 F.3d 24, 40 (2d Cir. 2006).  The Second Circuit has made clear that, before certifying a class, the court must conduct a "rigorous analysis" to ensure that every Rule 23 requirement has been satisfied. *Id*. at 32-33, 41.  In determining whether plaintiffs have met this burden, the Court should not accept all allegations in the complaint as true, but instead "must receive enough evidence, by affidavits, documents, or testimony, to be satisfied that each Rule 23 requirement has been met." *Id*.

Plaintiffs here cannot establish the required elements of Fed. R. Civ. P. 23(a) and (b), because they cannot meet the commonality, typicality, adequacy of representation, or predominance requirements of the Rule.

## I.     PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(A)

### A.     Plaintiffs' Claims Are Not Subject to Common Proof.

Commonality requires that plaintiffs demonstrate that "there are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Under this requirement, it is not sufficient to show that putative class members "have all suffered a violation of the same provision of law." *Dukes*, 131 S. Ct. 2541, 2551 (2011).  Rather, "[t]heir claims must depend on a common contention . . . that is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one

stroke." *Id.* Because the question of independent contractor status is not an issue that can be resolved for the entire putative class "in one stroke," plaintiffs do not meet the commonality requirement of Rule 23(a). *Id.*

A central issue for purposes of the instant class certification motion—whether plaintiffs were properly classified as independent contractors under the New York Labor Law—is not susceptible to common proof. "[T]he critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (N.Y. 2003). Plaintiffs make no effort to address whether this standard can be addressed with common evidence, because they mistakenly cite *Brock v. Superior Care,* 840 F.2d 1054 (2d Cir. 1988) and the "economic realities" test as the applicable test. (Pl. Motion at 18.) This failure is fatal, because the inquiry under the "economic realities" test and the test for independent contractor status under the New York Labor Law are different. *See, e.g.*, *Velu v. Velocity Exp., Inc.*, 666 F.Supp.2d 300, 307 (E.D.N.Y. 2009).[1] Plaintiffs cannot meet their burden for class treatment when they fail to make the necessary showings under Rule 23 as to the claims for which they seek certification. *See Dukes*, 131 S. Ct. at 2551.

Even if plaintiffs had attempted to meet their burden, their effort would have been futile. The inquiry to determine whether an individual is an independent contractor under the New York Labor Law focuses on "the degree to which the purported employer exercises control in fact over the results produced or the means used to obtain them." *Edwards v. Publishers Circulation*

---

[1] Plaintiffs argue in their motion that the independent contractor analysis is the same under the FLSA and New York Labor Law, but the case they cite for this proposition concerns a joint employer analysis. *See Hart v. Rick's Cabaret Int'l, Inc.*, No. 09 Civ. 3043(JGK), 2010 WL 5297221, at *2-3 (S.D.N.Y. Dec. 20, 2010). There is no allegation here that the USTA is a joint employer with some other entity.

*Fulfillment*, 268 F.R.D. 181, 184 (S.D.N.Y. 2010).  Factors relevant to this determination include
"whether the worker (1) worked at his own convenience, (2) was free to engage in other
employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a
fixed schedule."  *Id*.  In addition, "it is a 'significant consideration' if the person classifies
himself or herself as an independent contractor for income tax purposes."  *Deboissiere v. Am.
Modification Agency*, No. 09-CV-2316 (JS)(MLO), 2010 WL 4340642, at *3 (E.D.N.Y. Oct. 22,
2010) (quoting *Gagen v. Kipany Prods., Ltd*., 812 N.Y.S.2d 689, 690-91 (3d Dept. 2006)).  The
record shows that plaintiffs' factual and legal theories relating to these issues are not common
across the putative class.

For example, a central element of plaintiffs' claim that they are employees is their
contention that they were subject to uniform control by the USTA based on evaluations that
plaintiffs argue assessed "the way you stand, the way you walk . . . how loud your voice is."  (Pl.
Motion at 12.)  But some umpires are not subject to these evaluations at all. (Oleson Decl., Ex. 5
(Kaufman Tr.) at 105:14-106:17).  And even among those who are, the frequency and alleged
impact of these evaluations on the umpires' performance varies.  (*See id*. at 99:2-19, Oleson
Decl., Ex. 2 (Johnson Tr.) at 185:15-186:17, Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 122:8-
123:16, Oleson Decl., Ex. 5 (Kaufman Tr.) at 80:17-84:9.)  Because the determination of the
degree of control exercised by the USTA over the umpires is made based on the control "in fact
exercised" over them, plaintiffs have not, and cannot, show that the "truth or falsity [of this
question] will resolve an issue that is central to the validity of each one of the claims in one
stroke."  *Dukes*, 131 S.Ct at 2551; *Edwards*, 268 F.R.D. at 184.

Similarly, plaintiffs' argument that they are independent contractors because they are
subject to control through the USTA's certification requirements is not common to the class.  (Pl.

13

Motion at 6-7, 9.)  The record shows that the application and extent of the purported "control" imposed by these requirements varies markedly across the putative class.  First, and most importantly, many US Open umpires *are not certified by the USTA at all*, and thus are not subject to this purported "control."  (Oleson Decl., Ex. 5 (Kaufman Tr.) at 59:15-62:2.)  Among those umpires that have obtained USTA certification, some have passed only an introductory written test and obtained "provisional" certification, while others have undergone far more extensive training and met certain requirements regarding the number of matches they must officiate to obtain higher certifications.  (*Id* at 61:13-64:13.)  Thus, if plaintiffs are correct that the certification process demonstrates "control" over umpires (a proposition the USTA denies), their class motion must fail because umpires differ in whether and to what extent this factor affected them.  Determining the degree of control allegedly imposed on the four named plaintiffs will not answer this question as to all other class members.  *Dukes*, 131 S.Ct at 2551.

The different roles and responsibilities of class members also defeat commonality.  The authority and purported "control" exercised over line and chair umpires varies, as does the relative frequency in which US Open umpires perform each role.  (*See* Oleson Decl., Ex. 1 (Meyer Tr). at 89:6-11; Oleson Decl., Ex. 2 (Johnson Tr.) at 38:15-39:21, 42:8-44:13, 115:8-14; Oleson Decl., Ex. 3 (Bell Tr.) at 135:15-136:15;  Oleson Decl., Ex. 4(Mulligan-Gibbs Tr.) at 34:23-35:22.)  Plaintiffs claim that the USTA "controls" umpires through the rules of tennis, but fail to acknowledge that chair umpires, for example, have broad discretion and greater responsibilities than line umpires under these rules.  (*See* Oleson Decl., Ex. 2 (Johnson Tr.) at 38:15-39:21, 40:14-41:5, Oleson Decl., Ex. 5 (Kaufman Tr.) at 44:12-2.2)  Because some putative class members served exclusively as line umpires, others as only chair umpires, and others served in both roles to varying degrees, plaintiffs have not met their burden to show that

this additional claim of "control" is susceptible to a common answer that will resolve this element of plaintiffs' case. *Dukes*, 131 S.Ct at 2551.

Plaintiffs also have failed to show how a jury can assess the "significant consideration" of a person's tax reporting status on a classwide basis. *See Deboissiere*, 2010 WL 4340642, at *3 (quoting *Gagen*, 812 N.Y.S.2d at 690-91). Plaintiffs offer no argument as to how the jury can determine how this factor should apply to each putative class members. Nor could they, particularly when they themselves have varied in the manner in which they report their expenses and revenue from the US Open for tax purposes. (*Compare* Oleson Decl., Exs. 15-17; Oleson Decl., Exs. 32-33; Oleson Decl., Exs. 23-27, Oleson Decl., Ex 3 (Bell Tr.) at 270:8-274:10, with Oleson Decl., Ex. 1 (Meyer Tr.) at 168:7-169:7.)

Finally, plaintiffs have not addressed the impact of the remaining independent contractor factors on their New York Labor Law claim. The evidence suggests that consideration of these factors also impedes "the capacity of a classwide proceeding to generate common answers . . . ." *Dukes*, 131 S.Ct at 2551 (*quoting* Nagareda, Class Certification in the Age of Aggregate Proof, 84 N.Y.U.L.Rev. 97, 132 (2009)). For example, some plaintiffs claim that they were subject to the USTA's scheduling whims, while others understood they could make themselves available to officiate only certain days of the tournament based on their personal and professional schedules. (*See* Oleson Decl., Ex. 2 (Johnson Tr.) at 117:15-119:6, Oleson Decl., Ex. 3 (Bell Tr.) at 100:3-101:16, Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 68:12-73:4.) Similarly, some plaintiffs admitted they were free to decide whether or not they wanted to officiate at the US Open, while others felt they were compelled to do so. (Oleson Decl., Ex. 2 (Johnson Tr.) at 119:14-17, Oleson Decl., Ex. 3 (Bell Tr.) at 100:3-101:16.) Plaintiffs have not attempted to meet their

burden to show how these factors, which are critical to a determination of independent contractor status, can be assessed on a classwide basis.

It is not enough for plaintiffs to claim that certain common evidence exists, in the form of manuals or rules, to meet the commonality requirement.  Thus, in *Edwards*, the Court held that plaintiffs had failed to show commonality where plaintiffs relied on various manuals and training materials distributed by defendant to assert, as plaintiffs attempt to do here, that defendant "had a common policy of reserving control over the means by which the purported class members [performed services]."  268 F.R.D. at 187.  "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common answers . . . ."  *Dukes*, 131 S.Ct at 2551.  As the *Edwards* court recognized, a plaintiff may not establish commonality by relying on classwide evidence that is but a small part of the analysis necessary to reach a classwide determination on the merits of plaintiffs' claims.  *Edwards*, 268 F.R.D. at 187.  Plaintiffs have not met their burden to make that showing here, and accordingly their motion for class certification must be denied.

### B.      The Named Plaintiffs Are Not Typical of the Class.

Plaintiffs also have not met their burden to establish typicality under Fed. R. Civ. P. 23(a).  "Typicality requires that "the claims of the class representative be typical of those of the class, and is therefore satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability."  *Myers v. Hertz Corp*., No. 02 Civ. 4325(BMC)(MLO), 2007 WL 2126264, at *6 (E.D.N.Y. Jul. 24, 2007) (*quoting Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997)).  "The commonality and typicality requirements of Rule 23(a) tend to merge.  Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and

16

whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Dukes*, 131 S.Ct. at 2551 n. 5 (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157-158 n. 13 (1982).

As discussed above, the variations across the class make it impossible for plaintiffs to show that their claims are typical of all other putative class members. Plaintiffs cannot make "similar legal arguments to prove [the USTA's] liability" because these arguments depend on individualized evidence that will vary from class member to class member. *Marisol A.*, 126 F.3d at 376. Because each class member's claim is distinct and does not "arise[] from the same course of events," the named plaintiffs cannot adequately represent the putative class. *Myers*, 2007 WL 2126264, at *6. "Therefore, for the same reason that plaintiffs fail to meet the commonality requirement, they likewise fail to meet the typicality requirement." *Id.*

## C. Plaintiffs Are Not Adequate Representatives of the Class.

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). As the Supreme Court has explained, the commonality and typicality requirements of Rule 23 "tend to merge with the adequacy-of-representation requirement . . . ." *Dukes*, 131 S. Ct. at 2551 n.5. This is because both commonality and typicality "serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Id*. Because the claims of the named plaintiffs and those of each potential class member are not so interrelated, but rather may be resolved only through individualized determinations, the named plaintiffs cannot adequately represent the interests of all umpires who work at the US Open.

The adequacy requirement "also raises concerns about the competency of class counsel and conflicts of interest." *Dukes*, 131 S. Ct. at 2551 n.5. Adequacy of representation requires that there be "no conflict of interest between the named plaintiffs and other members of the plaintiff class." *See Marisol A*, 126 F.3d at 378; *Sheridan v. Liquor Salesmen's Union, Local 2*, 60 F.R.D. 48, 52 (S.D.N.Y. 1973) (where some members of the proposed class profited from and others were harmed by defendant's commission policy, the conflict within the class prevented the plaintiffs from satisfying Rule 23's adequacy requirement). Here, a clear conflict of interest exists between the named plaintiffs and the proposed class they seek to represent. Many, if not all, of the potential class members rely on their independent contractor status to receive preferential tax treatment regarding their income and expenses as tennis umpires. (*See, e.g.*, (Oleson Decl., Exs. 15-17; Oleson Decl., Exs. 32-33, Oleson Decl., Exs. 23-27,, Oleson Decl., Ex 3 (Bell Tr.) at 270:8-274:10.) Plaintiffs' request to reclassify all umpires at the US Open as employees is in direct conflict with these class members' interests. For these reasons, plaintiffs are not adequate representatives of the class, *see, e.g.*, *Sheridan*, 60 F.R.D. at 52, and their class motion must be denied.

## II.   PLAINTIFFS HAVE NOT SATISFIED THE REQUIREMENTS OF RULE 23(b)(3)

Even if plaintiffs could succeed in establishing the requirements of Rule 23(a), their request for class treatment would fail under the predominance and superiority requirements of Rule 23(b)(3).

### A.   Common Questions Do Not Predominate.

To proceed on a class basis, plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3). In evaluating the predominance factor, the Court must consider the substantive

issues raised by the plaintiffs' claims and the proof relevant to each issue. *See, e.g., In re IPO*, 471 F.3d at 41. The predominance requirement is satisfied only if resolution of some the factual and legal issues in the case "can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002). This requirement "ensures that the class will be certified only when it would 'achieve economies of time, effort, and expense, and promote . . . uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.'" *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 204 (2d Cir. 2007) (*quoting Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997)). Thus, if resolution of the substantive issues requires individual proof, class certification is improper. *See, e.g., McLaughlin v. Am. Tobacco Co*., 522 F.3d 215, 234 (2d Cir. 2008), *partially abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co*., 553 U.S. 639 (2008).

Such is the case here. The gravamen of plaintiffs' complaint is that the USTA misclassified plaintiffs as independent contractors. "Under New York law, a person's status as an employee or an independent contractor is a fact-intensive inquiry" that depends upon a number of factors." *Deboissiere*, 2010 WL 4340642, at *3. As discussed above, "[t]he critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results," and involves factors such as "whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Bynog*, 1 N.Y.3d at 198 (N.Y. 2003). The tax status claimed by the individual and the principal that pays the individual are also significant

19

considerations. *Deboissiere*, 2010 WL 4340642, at *3. Thus, to establish the predominance factor, plaintiffs must establish by a preponderance of the evidence that resolution of this multi-factored inquiry can be made based on proof common to the entire class. *See Edwards*, 268 F.R.D. at 183-84. Plaintiffs have not made this showing—indeed, they do not address the standard for independent contractor status under the New York Labor Law at all. *See, e.g.*, *Deboissiere*, 2010 WL 4340642, at *4 (finding that because "Plaintiffs have submitted nothing at all concerning two of the factors" they "have not shown that these factors depend upon common instead of individualized questions").

Even if plaintiffs had utilized the correct legal standard, their request for class certification under Rule 23(b)(3) would necessarily fail because the evidence shows that resolution of the independent contractor question will turn on individualized issues. As discussed above, plaintiffs' theory that the USTA "controls the means and manner" by which plaintiffs umpire matches is based on a series of facts that are not common to the putative class. Thus, although plaintiffs claim umpires are subject to detailed and onerous evaluations, (Pl. Motion at 11), not all class members are subject to these evaluations, the number of evaluations conducted as to those that are varies, and even among the evaluated umpires, their testimony differs as to whether the evaluations affect the manner in which they call matches. (*See* Oleson Decl., Ex. 2 (Johnson Tr.) at 185:15-186:17, Oleson Decl., Ex. 4 (Mulligan-Gibbs Tr.) at 122:8-123:16, Oleson Decl., Ex. 5 (Kaufman Tr.) at 99:2-19) Similarly, plaintiffs' argument that USTA certification requirements "control" umpires is unique to each putative class member, because the certification levels (and the requirements to achieve them) vary among plaintiffs, and some of them are not subject to these requirements at all. (Oleson Decl., Ex. 5 (Kaufman Tr.) at 44:12-22, 59:22-61:5, 99:2-19, 106:7-107:7.) And plaintiffs ignore the material differences in the

responsibilities of line and chair umpires and other individualized evidence relevant to the

independent contractor analysis, such as the tax status claimed by putative class members on

their tax returns.[2]  (Oleson Decl., Exs. 15-17, Oleson Decl., Exs. 32-33, Oleson Decl., Exs. 23-

27, Oleson Decl., Ex. 1 (Meyer Tr.) at 168:7-169:7), Oleson Decl., Ex 3 (Bell Tr.) at 270:8-

274:10.)

The remaining common evidence plaintiffs purport will resolve the "critical inquiry" of

control on a class-wide basis is largely irrelevant to the independent contractor determination.

Plaintiffs point to certain other forms of purportedly common proof:  the Officials' Code of

Conduct; the US Open umpires handbook; and acceptance letters sent to each umpire after they

agree to officiate at the US Open.  (Pl. Motion at 18-19.)   But as an initial matter, this evidence

does nothing to resolve the independent contractor issue because, if anything,  it evinces only

incidental control over the results to be achieved by the contracted for work—control which is

entirely consistent with an independent contractor relationship.  *See, e.g.*, *Chaiken v. VV Pub.

Corp.*, 119 F.3d 1018, 1033 (2d Cir. 1997).  For instance, plaintiffs contend that these documents

will establish that the USTA required umpires to report to the US Open at certain times.  But this

fact would not support class certification because requiring that work be performed during

---

[2] Plaintiffs also have not shown how they can establish a *prima facie* case for overtime
compensation for each putative class member.  The number of days worked and the hours
worked each day by umpires are highly variable.  (*See* Oleson Decl., Ex. 2 (Johnson Tr.) at
117:15-119:6, Oleson Decl., Ex. 3 (Bell Tr.) at 100:3-101:16, Oleson Decl., Ex. 4 (Mulligan-
Gibbs Tr.) at 68:12-73:4, Oleson Decl., Ex. 5 (Kaufman Tr.) at 130:2-131:2.)  Plaintiffs have not
shown how they can make a threshold showing that each putative class member worked
uncompensated overtime—*i.e.*, worked more than 40 hours a week.  Plaintiffs claim that certain
common evidence exists that may allow them to estimate the amount of time worked by each
umpire, but this evidence is speculative and does not permit the factfinder to make any
reasonable inference that each individual class member worked overtime.  And even if it did, the
USTA would be entitled to introduce individualized evidence to rebut this showing.  *Anderson v.
Mt. Clemens Pottery*, 328 U.S. 680 (1946).

specific times does not indicate an employment relationship.  *See, e.g.*, *Edwards*, 268 F.R.D. at

186 (existence of agreements setting drivers' hours and requiring them to work at particular

times did not support class certification because these requirements were "largely irrelevant" to

the independent contractor analysis).

More importantly, these documents cannot, on their own, resolve the issue of "control"

As the Court reasoned in Edwards:

> [T]he critical determinant is the degree to which the purported employer
> exercises control in fact over the results produced or the means used to
> obtain them.  Accordingly, while forms of agreement and other
> standardized documents surely are pertinent to the analysis, they are not
> necessarily dispositive of what, ultimately, would be an individualized
> determination of the degree of control that PCF actually exercised over
> each of the putative class members.  A reliance even on unambiguous
> documents arguably would be insufficient to establish the requisite control
> in the fact of contradictory evidence.

*Edwards*, 268 F.R.D. at 184.  Instead, the jury's resolution of that factor must consider *all* of the

evidence of control (or lack thereof).  As the *Deboissiere* court noted:

> [Even if] certain factors suggest an employment relationship while other
> factors reflect a legitimate independent contractor classification, any
> particular proposed class member's status might be a close question that
> depends upon the 'significant consideration' of how the proposed class
> member defined himself or herself on tax returns, and whether the class
> member sought tax benefits associated with independent contractor status.

2010 WL 4340642 at *4.  As shown above, critical aspects of this assessment also are

individualized here.  Class certification accordingly must be denied, because resolution of this

critical substantive issue requires individualized proof.  *McLaughlin*, 522 F.3d at 234.

Plaintiffs cannot resuscitate their class contentions by arguing that resolution of their

claims may be proven by reference to the USTA's policy of classifying umpires as independent

contractors.  (Pl. Motion at 21.)  This contention is directly contrary to binding Second Circuit

precedent, which holds that the mere decision to classify an individual as outside the protections

of the New York Labor Law's overtime provisions does not establish predominance. *Myers v. Hertz Corp.*, 624 F.3d 537, 549 (2d Cir. 2010). As in *Myers,* a determination of whether plaintiffs are entitled to overtime under the New York Labor Law must be made by reference to the actual circumstances of each plaintiff. *See, e.g.*, *Edwards*, 268 F.R.D. at 184. Under these circumstances, "[t]he existence of a blanket exemption policy, standing alone, is not itself determinative of 'the main concern in the predominance inquiry: the balance between individual and common issues.'" *Myers*, 624 at 549 (quoting *In re Wells Fargo Home Mortg. Overtime Pay Litig.,* 571 F.3d 953, 958 (9th Cir. 2009)). Here, as in *Myers*, "the fact of common exemption does not establish whether all plaintiffs were actually entitled to overtime pay." *Id.* Instead, that determination can only be made by considering individualized evidence across a range of factors. (*See* Section I.A, *supra*.)

The cases plaintiffs rely on to support the propriety of class certification do not change this result. Indeed, these cases were either not decided under the legal standard relevant here, or are otherwise distinguishable. For example, the decisions in *Ansoumana v. Gristede's Op. Corp.*, 201 F.R.D. 81 (S.D.N.Y. 2001), *Hart*, and *Gonzalez v. Nicholas Zito Racing Stable, Inc*., No. 04 CV 22(SLT)(AKT), 2008 WL 941643 (E.D.N.Y. Mar. 31, 2008) either pre-dated or failed to cite, much less apply, the standard of review announced by the Second Circuit in *In re IPO*. As this Court has noted, *Ansoumana* and other Rule 23 cases that do not apply the *In re IPO* standard "are of limited precedential value . . . as they were decided under a different—and generally less restrictive—standard which, among other things, required district courts to accept the plaintiff's factual allegations as true." *Edwards*, 268 F.R.D. at 184 n. 10. Nor did *Gonzalez* involve the issue of independent contractor status, but instead involved the failure to pay overtime to low-wage horse stable workers (not umpires as plaintiffs misleadingly suggest), a situation that does

23

not implicate the individualized determination necessary to determine whether workers were properly classified as exempt from overtime.  *See* 2008 WL 941643.  Plaintiffs' reliance on *Odom v. Hazen Transp., Inc*., 275 F.R.D. 400 (W.D.N.Y. Aug. 5, 2011), is likewise misplaced, because in that case the parties had agreed that class certification was appropriate and the court certified the class for settlement purposes only without addressing the independent contractor analysis and how it could be made based on common evidence.  By contrast, where courts have applied the *In re IPO* standard to evaluate the propriety of certifying Rule 23 class actions in independent contractor cases brought under New York law, they have denied class treatment. *See Edwards*, 268 F.R.D. at 188; *Deboissiere*, 2010 WL 4340642, at *4.

Plaintiffs have not, and cannot, meet their burden to prove by a preponderance of the evidence that common issues of law or fact predominate over individualized issues.  Because their substantive claims necessarily require the consideration of individualized evidence, their motion for class certification must be denied.

**B.     A Class Action Is Not Superior to Other Available Methods of Adjudicating Plaintiffs' Claims.**

Plaintiffs also cannot show that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  A class action is not superior where, as here, the central question in the case can be resolved only through individualized proof.  *See, e.g.*, *Ruggles v. WellPoint, Inc*., 272 F.R.D. 320, 341 (N.D.N.Y. 2011) ("Because individualized proof is required to determine the correctness of Defendant's categorizing putative class members as exempt, a class action is not a superior mechanism for adjudicating their claims."); *Dunnigan v. Metro. Life Ins. Co*., 214 F.R.D. 125, 142 (S.D.N.Y. 2003) (superiority requirement not met where "a series of mini-trials" would be necessary).

The USTA has a due process right to litigate its defenses against each umpire.  *See, e.g.*,

24

*Novak v. Home Depot, U.S.A., Inc.*, 259 F.R.D. 106, 116 (D.N.J. 2009); *Spencer v. Beavex, Inc.*,

No. 05-CV-1501 WQH (WMc), 2006 WL 6500597, at *16 (S.D.Cal. Dec. 15, 2006) ("Defendant

is entitled to raise independent contractor status as a defense and to present proof likely to be

highly individualized.  For these reasons, the Court finds that the individual questions

predominate over common issues, and that proceeding as a class action would not be superior to

other available methods of adjudicating the controversy.").  The USTA is entitled to present

evidence on all relevant factors that is individual to each potential class member—including,

without limitation, individual tax returns showing that individual umpires relied on their

independent contractor status when claiming certain tax deductions.  Such individualized

inquiries would render a class action wholly unmanageable.  *See, e.g., Feinstein v. Firestone Tire

& Rubber Co.*, 535 F. Supp. 595, 608 (S.D.N.Y. 1982) (certification would "unleash a

Frankenstein monster of unmanageability, weighted down with individual questions of fact and

law which clearly predominate" since liability turned on the performance of individual car tires).

Where individualized determinations are necessary for resolution of plaintiffs' claims, individual

lawsuits are superior to class treatment.  *See, e.g., In re Fosamax Prods. Liab. Litig.*, 248 F.R.D.

389, 403 (S.D.N.Y. 2008) (individual actions superior where individual determinations are

necessary); *Dunnigan*, 214 F.R.D. 125, 142 n.15 (S.D.N.Y. 2003) ("[T]he bringing of individual

suits is no less efficient, and indeed more appropriate, than the adjudication of individual claims

of unreasonableness through a large number of mini-trials.")

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Class Certification, Appointment of

Class Representatives, and Appointment of Class Counsel should be denied.

Respectfully submitted,

DATED: July 31, 2012 _____/s/_____

Richard J. Rabin
Kelly L. Brown
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
rrabin@akingump.com
kbrown@akingump.com

Nathan J. Oleson
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
noleson@akingump.com

ATTORNEYS FOR DEFENDANT
UNITED STATES TENNIS ASSOCIATION

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Memorandum of Law in Support of Defendant United States Tennis Association's Opposition to Plaintiffs' Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel was served this 31st day of July, 2012 via the ECF filing system (registered users) or via U.S. Mail on the following:

Judith L. Spanier, Esq.
Orin Kurtz, Esq.
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016

Mitchell Schley, Esq.
LAW OFFICES OF MITCHELL SCHLEY, LLC
245 Park Avenue, 24th Floor
New York, NY 10167

_____/s/_____
Kelly L. Brown

27