```
 1    CCIBUSTC                        Conference

 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ------------------------------x

 4    STEVEN MEYER, MARC BELL, LARRY
      MULLIGAN-GIBBS and AIMEE
 5    JOHNSON, on behalf of
      themselves and all others
 6    similarly situated,

 7                 Plaintiffs,

 8          v.                              11 Cv. 6268 (ALC)

 9    UNITED STATES TENNIS
      ASSOCIATION,
10
                 Defendant.
11
      ------------------------------x
12                                          New York, N.Y.
                                            December 18, 2012
13                                          3:03 p.m.

14    Before:

15                 HON. MICHAEL H. DOLINGER,

16                                          Magistrate Judge

17                            APPEARANCES

18    ABBEY SPANIER RODD & ABRAMS, LLP
           Attorneys for Plaintiffs
19    ORIN KURTZ

20    AKIN GUMP STRAUSS HAUER & FELD LLP
           Attorneys for Defendant
21    NATHAN J. OLESON

22

23

24

25
```

1              (In open court)

2              THE COURT:  Okay.  What's going on in this case?

3              MR. KURTZ:  Good afternoon, your Honor.  Orin Kurtz

4      for the plaintiffs.  We're here on the premotion conference for

5      a requested motion to compel.  The plaintiffs in this case

6      allege that-- the plaintiffs in this case are umpires working

7      at the U.S. Open Tennis tournaments.  They allege that they

8      have been misclassified as independent contractors and, along

9      with that, denied overtime pay under the Fair Labor Standards

10     Act and New York law.

11             The U.S.T.A. has requested to make a motion for

12     summary judgment, and one of the arguments that it has made is

13     that even if the umpires are properly classified as

14     independent-- as employees, then they're exempt from the

15     coverage of the Fair Labor Standards Act and New York law based

16     on an exemption that I'll call the seasonal exemption.  And

17     that's 29 U.S.C. 213(a)(3).

18             The relevant part of that exemption to what we're here

19     today is that the U.S.T.A. must show that it is a recreational

20     organization and it must show that its receipts for any six

21     months of the year are less than 33 percent of the receipts for

22     the other six months of the year.

23             We have requested documents about that exemption.

24     Courts have unanimously held that it's construed narrowly

25     against the employer and that an employee should only be

1  exempted if clearly and unmistakably within the purview of the

2  exemption.

3          So we've requested documents about that exemption and

4  have propounded interrogatories.  The main issue that our

5  documents are directed towards is whether the U.S.T.A. is a

6  recreational organization within the meaning of the statute.

7          THE COURT:  What is a recreational organization?

8          MR. KURTZ:  Well, it's an organization whose purpose

9  is to provide recreation and whose activities are about

10  recreation.  The CFR says that a typical --

11          THE COURT:  Recreation by whom?  By the public

12  generally or by some specified subset of the public?

13          MR. KURTZ:  It's the public.  There have been cases

14  debating whether it has to be open to the public.  As a general

15  matter, it's to the public.

16          The Code of Federal Regulations has said that a

17  typical recreational organization is a concessionnaire at an

18  amusement park.  In our contention, a small organization.  And

19  the Courts have held that the statute was enacted, the

20  exemption, to allow these small organizations to operate

21  without having to pay the relatively high wages of a Fair Labor

22  Standards Act because they're only going part of the year.

23          THE COURT:  Have there been determinations made by

24  courts or otherwise as to whether the term "recreational

25  organization" encompasses the provision of sporting or other

1    amusements to be observed by the public at large?

2          MR. KURTZ:  There have been decisions about that, yes.

3    There have been cases where the parties are disputing whether

4    the employees are covered under this exemption.  And the

5    defendant was-- there was the Sarasota White Sox were once a

6    defendant, which is a Minor League Baseball team.  There are --

7          THE COURT:  What outcome?

8          MR. KURTZ:  What outcome?  In that case the Court held

9    that the employer was a recreational establishment.

10         There was also a case called *Bridewell v. Cincinnati*

11   *Reds*.  There the Reds were not held to be within the exemption.

12   The arguments, I believe, were not exactly on point with what

13   we're discussing here, but there were cases like that.

14         THE COURT:  Okay.

15         MR. KURTZ:  So our document requests-- and there's a

16   case called *Chow*-- I'll have to pull it up, but there's a case

17   that we cited in our opening and reply letter.

18         THE COURT:  *Chow v. WJJ Resort Ranges*, a Sixth Circuit

19   case.

20         MR. KURTZ:  Yes.  That case, and along with a case

21   cited by the defendants here, expressly looked at the purpose

22   of the organization to determine whether it was a recreational

23   organization.

24         We have requested documents here asking about the

25   U.S.T.A.'s purpose.  We have some indication that the U.S.T.A.

is designed not for recreation, but, as it states in its tax

returns and on its website, that its submission is to promote

and develop the sport of tennis.

THE COURT:  Why is that necessarily inconsistent with

recreation?  Again, depending upon on what recreation means, it

seems to me the distinction arguably can be drawn between

participating in an activity, like softball, baseball or

tennis, or sitting on a bench watching someone else doing it.

Now, one of them or the other of them or both of them

might be recreational within the meaning of this term, but I'm

not clear from what you're saying whether both of them are.  If

the latter, that is sitting and observing someone else engaging

in profitable recreation, such as professional tennis, is not

in itself recreation, then I don't know that there would be any

dispute in this case, I mean a genuine dispute, because

presumably U.S.T.A. operates in such a way that it sells

tickets to a sporting event that either is either within the

definition of recreational or it's not, I would think.

And that's apart from the question of whether the

receipts for six months are greater than 33 percent of the

total receipts for the year, which I suppose is a pure

financial issue which would be in financial documents.  But I'm

not sure what it is you're proposing in terms of disputed

document production that would speak to whether what the

U.S.T.A. does, which I take it is not a secret, whether that

1   constitutes a recreational organization or not.

2               MR. KURTZ:  Well, that's why we requested the

3   documents we have, which is to show that the U.S.T.A.'s purpose

4   is not recreation, but the promotion of a sport.  And we've

5   requested-- the U.S.T.A.'s certificate of incorporation or

6   bylaws sets out that there will be a board of directors to

7   implement the U.S.T.A.'s policies and objectives.

8               THE COURT:  Is there a dispute about whether you can

9   get the bylaws?

10              MR. KURTZ:  No, the bylaws are publicly available and

11  we have them.

12              THE COURT:  Okay.

13              MR. KURTZ:  But we've requested the contracts with the

14  board of directors, which I understand there may not be, but

15  there are also two people who are executive directors and I

16  understand that the U.S.T.A. is contending that they are not

17  directors.  Our position is that our request for director

18  contracts would encompass the executive director as well.

19              THE COURT:  And the relevant-- has that been objected

20  to?

21              MR. KURTZ:  Yes.

22              THE COURT:  Okay.  On what grounds?  Relevance?

23              MR. KURTZ:  Relevance.  I think they were pretty form

24  objections:  Relevance, overbroad.

25              THE COURT:  The usual suspects.

1          MR. KURTZ:  The usual suspects.

2          THE COURT:  On the question of relevance, what is the

3    relevance of a contract that U.S.T.A. has with either an

4    executive director or any other particular director?

5          MR. KURTZ:  Well, the U.S.T.A. is paying these people

6    between a million dollars one year, nine million dollars one

7    year.

8          THE COURT:  I'm in the wrong profession.

9          MR. KURTZ:  We want to know why the U.S.T.A. is paying

10   them.  Why are they hired by the U.S.T.A. to do the work?

11   What's the-- what's the --

12         THE COURT:  Someone's got to run an organization.  I'm

13   not sure I follow what the relevance of that is to whether it's

14   a recreational organization or not.

15         MR. KURTZ:  Well, we want to know what's the work that

16   they're hired to do?  If the work that they're hired to do is

17   go out and teach tennis, that would be one thing.  But if

18   they're hired to raise a lot of money, that might be an

19   entirely different story.  This is an organization that takes

20   in $200 million a year and issues bond offerings and has a very

21   large financial footprint, and we would like to know what are

22   the workings behind that and what is the underlying reason for

23   all of it.

24         THE COURT:  The underlying reason for what?

25         MR. KURTZ:  Well, what is the underlying reason that

1    these executive directors are being paid what they do?  What

2    goal of the U.S.T.A. are they furthering to get that money?

3        THE COURT:  Well, let me ask you this:  Is it clear

4    whether an organization whose purpose is to draw in people --

5    and presumably to fill its coffers -- by inducing them to watch

6    a sporting event, whether that's a recreational organization or

7    not?

8        MR. KURTZ:  There hasn't been-- there's not a lot of

9    case law out there on this, and I haven't seen a decision that

10   really looked at that question and said is it-- you know, that

11   really dissected the --

12       THE COURT:  Is that really going to be the issue here

13   or is there some other set of issues that are lurking in the

14   shadows, so to speak?

15       MR. KURTZ:  There's no issue that I know of in the

16   shadows.  It's really we want to see the workings of this.

17       THE COURT:  I'm not asking about what you want to see.

18   I'm trying to get a definition of what the dispositive issue is

19   for determining whether U.S.T.A. is a recreational organization

20   within the meaning of the statute.

21       Am I correct in surmising from what you've said that

22   the determinative issue, since there's no dispute really that

23   the U.S.T.A. holds a tournament, or multiple tournaments for

24   that matter, to which the public is invited to come at the

25   price of buying a ticket to observe athletes participating in a

1    given sport, to attend, whether that type of function by an

2    organization makes it a recreational organization?  Is that the

3    question that's going to determine at least whether they have a

4    shot at getting this exemption?

5              MR. KURTZ:  That's one of the questions, yes.

6              THE COURT:  What are the other questions apart from

7    the 33 percent financial issue?

8              MR. KURTZ:  Well, okay.  Yes, that is the question.

9    That is the question and we'll --

10             THE COURT:  That's a pure legal question, isn't it,

11   really, if there's not a particular dispute about what the

12   U.S.T.A. does?

13             MR. KURTZ:  Well, we don't know exactly what the

14   U.S.T.A. does at this point.  I mean, we know that it --

15             THE COURT:  You know it holds tournaments.

16             MR. KURTZ:  We know it holds tournaments.

17             THE COURT:  What other areas do you suspect it may be

18   engaged in?

19             MR. KURTZ:  Well, we know that it has seven hundred

20   thousand members and it takes in a lot of dues from them.  In

21   connection with its tournaments, it procures a lot of corporate

22   sponsorship.  It's involved in tennis throughout the world and

23   throughout the U.S. paying millions and millions of dollars to

24   athletes.

25             THE COURT:  Okay.  So you want the contracts with

1    these executive directors?

2              MR. KURTZ:  Right.

3              THE COURT:  Okay.  What else?

4              MR. KURTZ:  We wanted the minutes of the board of

5    directors meetings and of the meeting of the past presidents of

6    the United States Tennis Association.

7              THE COURT:  I'm sorry, you want the minutes of the

8    board of directors meetings.

9              MR. KURTZ:  Yes.

10             THE COURT:  Which I take it you would say might

11   reflect the institutional purpose and function of the U.S.T.A.

12             MR. KURTZ:  Yes.

13             THE COURT:  What is this about past presidents?  What

14   is it you are seeking?

15             MR. KURTZ:  Well, there's a meeting-- there's meetings

16   that are held by the past presidents of the U.S.T.A.  It's our

17   understanding that financial matters are discussed at these

18   meetings.  They're open to the public.  One or more of our

19   plaintiffs has been to them.

20             THE COURT:  These are like annual meetings?

21             MR. KURTZ:  Yes, I believe they are.

22             THE COURT:  Okay.

23             MR. KURTZ:  We have also asked for the U.S.T.A.'s

24   applications for not-for-profit status.  In order to apply for

25   not-for-profit status under IRS Code 501(c), a company has to

1    state its purpose.  There is an exemption under that statute

2    under 501(c)(7) that allows recreational organizations to claim

3    tax-exempt status.  The U.S.T.A. has chosen a different

4    exemption for business needs, boards of trade, real estate

5    boards.

6            And so we're interested-- although the U.S.T.A. states

7    on its tax returns what its purpose is, we would like to see

8    what is also stated in those applications.

9            THE COURT:  You've seen their tax returns?

10           MR. KURTZ:  We have.

11           THE COURT:  Okay.

12           MR. KURTZ:  There's also a line of-- there's also some

13   case law out there looking at the idea that because this

14   statute-- because this exemption was enacted to allow the small

15   companies who operate on a seasonal basis to pay their

16   employees wages without the Fair Labor Standards Act's high

17   requirements, that some organizations may not be of the type

18   that's intended to fit within this statute.  And it's our

19   contention here that that's what the U.S.T.A. is going to fall

20   under.  And we've requested --

21           THE COURT:  I'm sorry.  When you say "that" is what

22   the U.S.T.A. is going to fall under, what is the "that" that

23   you're referring to?  Obviously you're not saying they're going

24   to fall into an exemption, but I'm not sure what you're saying

25   they are going to fall into.

1          MR. KURTZ:  It's out contention that they are not the

2     type of organization that was designed to fall under this

3     exemption.  They are not the mom-and-pop shop operating as a

4     concessionnaire on a boardwalk.  They're a large organization

5     that takes in a lot of money and --

6          THE COURT:  Is there anything in the regulations or

7     the statute that puts a cap on revenue or is the only thing

8     that you see in the regulations is the 33 percent rule?

9          MR. KURTZ:  I have not seen any language saying

10    there's a cap on revenue.

11         THE COURT:  Have you seen any case law or agency

12    rulings that would suggest a mom-and-pop limitation on the

13    exemption?

14         MR. KURTZ:  With those exact words?  No.

15         THE COURT:  In sum and substance, if not in those

16    exact words.

17         MR. KURTZ:  Well, it's the idea that the federal

18    regulations expressly state that the type of organization that

19    is typical under this exemption is one that is a

20    concessionnaire.  And that's 29 CFR 779.385.  It says "Typical

21    examples of recreational"-- in brackets, that's our quote --

22    "of [recreational organizations]" -- out of the brackets --

23    "are the concessionnaires at amusement parks and beaches."

24          To me there's a -- I suppose a concessionnaire could

25    take in $200 million in a summer, but to me there's a size

```
 1   limitation in there.  There's something saying this is really

 2   designed to protect the small company, not the company like

 3   this.

 4             THE COURT:  By the way, has there ever been any ruling

 5   either through an agency action or through litigation in other

 6   sports that would pose the same issue?  For example, Major

 7   League Baseball I guess employs umpires.  Has there been a

 8   ruling as to whether Major League Baseball is or isn't exempt

 9   as a recreational organization?  Or other sports.  You could

10   name plenty of them, I'm sure.

11             MR. KURTZ:  I've seen a case with the-- it was a

12   basketball team in Louisiana.  And there the issue-- the first

13   name of the case was Liger, L-i-g-e-r.  I don't recall the rest

14   of it.  There the issue was a different issue than what we

15   have, but the Court did seem to entertain that this company

16   was-- that this basketball team was not exempt.

17             I don't have the exact holding with me right now, but

18   there was an argument over how to look at the receipts part of

19   the statute.  But if the company was exempt, there would be no

20   need to look at the receipts.

21             THE COURT:  Okay.  So you are now referring to, I

22   guess, some form of request, be it interrogatories or document

23   requests, that are intended to test whether the U.S.T.A. is

24   prototypical within the universe, or within the universe of

25   this particular exemption.
```

1          What specifically are you referring to?

2          MR. KURTZ:  That's right.  Well, we are aware that the

3     U.S.T.A. does pay some of its employees overtime.  We're

4     looking to see how many employees, who they pay, what their pay

5     is.  If this exemption were available to the U.S.T.A., we're

6     not really sure why the U.S.T.A. wouldn't take it in all

7     instances.  So we had an interrogatory that asked to-- that

8     asked the U.S.T.A. to identify which employees they pay

9     overtime and to provide the payroll information for those

10    employees.

11         The U.S.T.A.'s response was we pay certain employees

12    overtime.  Our contention is that's evasive and it's answering

13    half of the question.  We do pay certain employees, but we want

14    to know who and how and what and how much.

15         THE COURT:  Do I have a copy of your interrogatories?

16    I don't -- quickly leafing through here -- see them and I don't

17    get the impression that your letter application quotes the

18    interrogatory.  Perhaps it would be helpful if you at least

19    read what the interrogatory asked for.

20         MR. KURTZ:  Sure.

21         THE COURT:  I should observe parenthetically that the

22    rules of this Court require that any application for relief

23    under Rule 37 include copies of both the request for discovery

24    and the responses.  That's just to help the Court quickly

25    analyze whether, textually speaking, the request is proper and

1   is being responded to in a responsive way.

2              MR. KURTZ:  Thank you, your Honor.  Next time if that

3   comes up, I will change that.

4              This interrogatory requests whether the U.S.T.A.-- I

5   don't know if I have the exact text with me here, but it

6   requested --

7              THE COURT:  Does anyone?

8              MR. KURTZ:  I'm sorry?

9              THE COURT:  Does anyone have it?

10             MR. OLESON:  I'm sorry, your Honor, I was supposed to

11  go back to D.C. before I came here, but today I got rescheduled

12  to come here straight from Dallas so I don't have the folder

13  with me.

14             THE COURT:  Okay.  So we have a somewhat mysterious

15  interrogatory that the plaintiff says has not been responsively

16  answered.  And I take it you're saying that the interrogatory

17  asked for the names of all employees who were paid overtime

18  since, according to your letter, January 1, 2005, and to

19  provide all the data.

20             MR. KURTZ:  Yes, your Honor, the names and the

21  payroll.

22             THE COURT:  Okay.  And the entirety of the response

23  that you got is that certain employees, unspecified, were paid

24  overtime, period.

25             MR. KURTZ:  That's right.

```
 1              THE COURT:  Okay.  What else?

 2              MR. KURTZ:  If that is the-- if that request is

 3   granted, then that's all we would need on that subject.

 4              THE COURT:  Any other issues?

 5              MR. KURTZ:  I believe not.  There's an additional

 6   document request, but we've begun discussions on how to resolve

 7   that on our own that I think we could...

 8              THE COURT:  Okay.  By the way, what is the current

 9   schedule for completion of discovery in this case?

10              MR. KURTZ:  Discovery with-- discovery, aside from

11   this, is complete for the named plaintiffs and class

12   certification.  We haven't gotten into class merits discovery.

13              THE COURT:  Is there a schedule for a class cert

14   motion?

15              MR. KURTZ:  That motion is totally briefed.

16              THE COURT:  Oh, okay.  So that's before Judge Carter?

17              MR. KURTZ:  Yes.

18              THE COURT:  Okay.  Anything else?

19              MR. KURTZ:  That's it for now, your Honor.

20              THE COURT:  Okay.

21              MR. OLESON:  Thank you, your Honor.  Nathan Oleson of

22   Akin, Gump, Strauss, Hauer & Feld for defendant U.S.T.A.

23              I'll take the last point first.  One other scheduling

24   issue.  We do have a-- we had made a request in May to file a

25   motion for summary judgment.  That request has been deferred
```

1    pending the completion of this discovery.  And based on the

2    last status conference that we had with Judge Carter, our

3    understanding was he was waiting for this to be completed and

4    potentially waiting for in limine motions for class

5    certification pending resolution of this and the filing of

6    summary judgment motion.

7          I wanted to just step back real quick and clarify some

8    points on the law.  First of all, is the statute itself.  As

9    Mr. Kurtz has noted, there are just really two requirements to

10   the statute:  One is the receipts test, whether two-thirds of

11   your receipts came in in a six-month period; the second part

12   is -- Mr. Kurtz described it as whether you're a recreational

13   organization.  The precise language, which is important in this

14   context, is whether the employee was employed by an

15   establishment, which is an amusement or recreational

16   establishment.

17         And obviously one point to make out there is that it

18   doesn't just have to be recreation to qualify.  It can also be

19   amusement.  So the spectator sporting event would, in our view,

20   easily fall under amusement if, for some reason, it didn't fall

21   under recreation.

22         The other point I would add is the use of the term

23   "establishment," which is a term of art within the F.L.S.A.

24   And within the F.L.S.A. establishment refers to -- and I'm

25   quoting here from the regulations -- a "distinct physical place

1    of business rather than an entire business or enterprise, which

2    may include several separate places of business."  And that's

3    29 CFR 77923.

4         And so our contention is this whole contention of this

5    whole argument that Mr. Kurtz made to you about the

6    organizational purposes is completely irrelevant here.  The

7    regulations and the statute look at establishment and that is a

8    physical place of business.  It's not the entire U.S.T.A. as an

9    entity.

10        In fact, Mr. Kurtz's authority and all the other

11   authority doesn't look at, you know, what other holdings a

12   company may have.  What it looks at is what happens at this

13   particular location?  So as Mr. Kurtz noted, the Minor League

14   Baseball team that operates the-- the worker that works at the

15   Minor League Baseball part is exempt.  He noted both the

16   *Cincinnati Reds* case and the *New Orleans Hornets* case.  And in

17   both of those cases, to my understanding, there's no dispute or

18   issue with respect to whether these were amusement or

19   recreational establishments when they held sporting events.

20   The issue was, could they meet the receipts tests given the

21   length of their operations?

22        Other examples that have been found --

23        THE COURT:  Well, wait.

24        MR. OLESON:  Sure.

25        THE COURT:  One thing that I find a little puzzling,

1    just looking at the language that you're citing, is that the

2    exception provides that the overtime requirements don't apply

3    with respect to an employee employed by an establishment and

4    that the term "establishment" refers to a distinct physical

5    place of business.

6           Now, I don't know how the plaintiffs in this case are

7    employed, but if they're employed by the U.S.T.A. rather than

8    by Forest Hills Tennis-- I date myself by referring to Forest

9    Hills as opposed to whatever is the place now that the U.S.

10   Open is conducted at.  If they are employed by the U.S.T.A., an

11   organization, it's a little hard to understand how such an

12   organization, which presumably has footprints in a lot of

13   different places, not just out in Queens, how you would satisfy

14   the language that's referred to here which sounds like, if

15   you're taking it literally -- that is, it's a place that you're

16   employed by, perhaps an amusement park which has been mentioned

17   here.  Because if you're employed by an amusement park, there's

18   a place where the amusement park is.  That's its location.

19   It's not an organization that happens to undertake or endorse

20   or promote activities here, there and everywhere.

21          So I'm a little bit puzzled, since you're putting much

22   emphasis on this definition here, how that helps you.

23          MR. OLESON:  Well, I --

24          THE COURT:  Again, we're not arguing a summary

25   judgment motion that hasn't been made, but since you're making

1   the point, I'm just a little bit puzzled by it.

2   　　　　MR. OLESON:  Certainly, your Honor.  The answer to

3   that is, again, what the regulations are talking about here is

4   they recognize that an enterprise -- and the enterprise is also

5   a term of art within the F.L.S.A -- an enterprise or business

6   organization can have many locations.  And you can be employed

7   by that enterprise at a particular location and that's the

8   establishment you're employed at.  So it talks here, again,

9   about these multi-unit locations.

10  　　　　THE COURT:  So do the plaintiffs, the umpires,

11  whatever they are, work only at one place?

12  　　　　MR. OLESON:  During the U.S. Open, which is the

13  subject of this lawsuit, they were only at the tennis grounds.

14  　　　　THE COURT:  But that's not what the question is.  If

15  they're employed by the U.S.T.A. and they work at a number of

16  different places, then it would be a stretch, I would think, to

17  say they're employed by the place, by Queens.  They're paid

18  over a period of time.  And I don't know what the form of

19  payment is or how that's done.  But if they're paid over a

20  period of time for services rendered here, there and everywhere

21  by the U.S.T.A., I'm not sure that it is a comfortable fit to

22  say they are employed sometime in whatever-- whether it's

23  August or September, whenever this particular tournament takes

24  place -- by an establishment in Queens.

25  　　　　MR. OLESON:  Right.

1            THE COURT:  They're employed by the U.S.T.A. and they

2    go to different places to supervise these various sporting

3    events.

4            MR. OLESON:  A couple points I'll make, your Honor.

5    First of all, some of these umpires may only work at the

6    U.S. Open.  So obviously for them that issue would not be

7    there.

8            THE COURT:  Yes.

9            I guess the second point is whether they're employed

10   by the U.S.T.A. obviously is also a point in dispute.  If they

11   are, the regulations and the law do recognize the possibility

12   that you can be employed at one establishment, move to another

13   establishment, and there are certain rules about what happens

14   in those situations.

15           But, again, we're not --

16           THE COURT:  But is there a dispute about whether

17   they're employed by the U.S.T.A.?  That's what you seem to be

18   saying.

19           MR. OLESON:  Well, we retain them as independent

20   contractors.  And so--

21           THE COURT:  Okay.  I follow.  But the relationship is

22   between them and the U.S.T.A., whatever the nature of the

23   relationship may be.

24           MR. OLESON:  Correct, Judge.

25           THE COURT:  Okay.

1              MR. OLESON:  But I just wanted to make those points

2      clear on the law to the extent that is a relevant consideration

3      for the Court.

4              THE COURT:  Sure.

5              MR. OLESON:  The other legal point I wanted to make

6      was about this -- I guess we'll call it the mom-and-pop issue.

7      We cited in our papers, in our response, Court authority

8      pointing to the legislative history where there was a specific

9      rejection of a revenue ceiling on this exemption.  In fact, the

10     statute and the regulations, neither of them contain any

11     revenue ceiling.

12             The statutory language is clear.  We cite it at page 2

13     of our opposition.  There's no reference in there to any

14     revenue hike.  In fact, in those cases that Mr. Kurtz cites

15     with the New Orleans Hornets and Cincinnati Reds, there's no

16     arguments there about the fact that their revenue was too high

17     to satisfy the exemption.  The question was whether the

18     receipts were concentrated enough to constitute two-thirds of

19     the receipts within the six-month period.

20             So I just wanted to make those two legal points.  We

21     cited the case I think at-- about the legislative history on

22     this issue, footnote 3 on page 4, *Brock v. Louvers & Dampers,*

23     *Inc.*, 817 F.2d 1255.

24             THE COURT:  By the way, again, I'm looking back at the

25     language that you both quote in your letter, and it says that

 1    the exemption applies "if the employee is employed by an

 2    establishment which is an amusement or recreational

 3    establishment if, A, it"-- and I assume that means the

 4    establishment-- "does not operate for more than seven months in

 5    any calendar year; or, B, during the preceding calendar year,

 6    its average receipts for any six months of such year were not

 7    more than 33 and 1/3 percent of its average receipts for the

 8    other six months of such year."

 9          I take it that an argument is made, or will be made or

10    has been made, by the defendants that the seven-month rule is

11    to be applied in this case looking only at one tournament, or

12    is there some-- or is it conceded that, in fact, all the

13    tournaments that U.S.T.A. undertakes are squished into seven

14    months?

15          MR. OLESON:  That's an either/or.  So you can meet the

16    test either by operating for only seven months, or by having

17    your receipts concentrated, two-thirds of which would be

18    concentrated in a six-month period.

19          THE COURT:  Right.

20          MR. OLESON:  So in this case, your Honor, we are

21    arguing the receipts test.  I think there could be an argument

22    made on the seven months.  But for the reasons you suggest,

23    we're just going to, you know, push that one to the side.

24          THE COURT:  Okay.  And when you talk about the

25    receipts, is this receipts solely for this one tournament that

1    you're saying meet this 33 percent test or all the receipts by

2    U.S.T.A.?

3         MR. OLESON:  What we've done, your Honor, our

4    contention would be it's just the term in itself.  But what

5    we've done is actually provided plaintiffs with both the

6    receipts for the tournament, but also the receipts for the

7    entire U.S.T.A.  Our position is that under both of those

8    standards -- either standard, we would meet the receipts test.

9         THE COURT:  Okay.  So --

10        MR. OLESON:  The vast majority of the income from the

11   U.S.T.A. comes from the U.S. Open itself.

12        THE COURT:  Is there additional revenue from

13   advertising of corporate sponsorship?

14        MR. OLESON:  There are some-- there's pieces of that,

15   as well, and there are membership dues, as well, yes.

16        THE COURT:  Television rights and that kind of thing?

17        MR. OLESON:  Correct, your Honor.

18        THE COURT:  Okay.  And that's all added in when you do

19   your 33 percent calculation?

20        MR. OLESON:  Correct, your Honor.

21        THE COURT:  Okay.

22        MR. OLESON:  I guess, going to the merits of

23   plaintiff's requests, the initial request for the board of

24   directors' contracts, as we've said in our papers and informed

25   plaintiffs, there are no actual contracts with the board of

1    directors, so we believe that issue is moot.

2            In their reply, for the first time, they said that we

3    should, in response to the request specifically for board of

4    directors' contracts, also produce the contract of the

5    executive director and of the chief of professional tennis.  We

6    obviously did not have a chance to address that in writing, but

7    we see no relevance of that to these two statutory criteria

8    that we reference here.  There's nothing, no case that we're

9    aware of, no regulation that we're aware of, nothing in the

10   statute that says somehow that the compensation of an

11   organization's chief executive officer is anywhere relevant to

12   these two statutory requirements.

13           THE COURT:  Well, let me ask this:  Contracts can

14   cover a number of different things.  Usually they will cover

15   compensation, obviously.  They will presumably also cover job

16   duties.  Why wouldn't job duties potentially be relevant, at

17   least as a discovery matter, to the plaintiff's theory of

18   purpose as they interpret the exemption that's at issue here?

19           MR. OLESON:  Sure.  The first thing about that, your

20   Honor, is obviously, again, back to the statute and the

21   establishment, the character of the establishment, what goes on

22   at the U.S. Open is what determines whether it's recreational

23   use, the nature of what happens at that physical location.

24           THE COURT:  Well, I take it you're arguing that the

25   only relevant activity is the U.S. Open.

1          MR. OLESON:  Well, our--

2          THE COURT:  And I'm a little bit puzzled by that,

3   putting aside whether if all the plaintiffs were only at the

4   U.S. Open, whether that's a viable argument.  But where you've

5   got plaintiffs who do presumably other activities as well for

6   the U.S.T.A., I'm not sure that that's an obvious and

7   appropriate limitation on the scope of the analysis.

8          And what's particularly concerning then is it seems as

9   if you're, in a sense, arguing the summary judgment motion as a

10  means of limiting discovery.  You'll have your theory about how

11  the exemption should be applied; plaintiffs will have their

12  theory.  But until their theory is rejected, it would seem as

13  if their general type of inquiry is at least within the realm

14  of relevance.

15         MR. OLESON:  A couple of things about that, your

16  Honor.  First is that, you know, obviously the relevance of the

17  evidence is dictated by what the legal issues are.

18         THE COURT:  Yes.

19         MR. OLESON:  And the legal issue here, again, under

20  the statute, is the establishment, the character of the

21  establishment, and what happens there is what determines

22  whether it's recreational amusement.  Again, they have cited no

23  case and no authority.

24         THE COURT:  But the problem is, as I think I've sort

25  of at least raised with you, is that it's not at all clear,

 1    certainly not clear beyond any question for purposes at least

 2    of discovery, that your hypothesis about the universe of

 3    relevant activity is viable given the way the exemption is

 4    worded.

 5            MR. OLESON:  Well --

 6            THE COURT:  And that if you've got an organization

 7    that engages in activities around the country, if not around

 8    the world, and some of the plaintiffs are involved at least in

 9    some of these various activities in various places, that you

10    can just say, well, the only thing that's relevant is what

11    happens out in Queens once a year.

12            MR. OLESON:  A couple --

13            THE COURT:  And if that's at least open to question,

14    not necessarily that it couldn't be decided on summary

15    judgment, but it's open to question until summary judgment is

16    decided, it's not clear to me why they shouldn't get discovery

17    pertinent to their theory which is, concededly, different from

18    your theory about how this exemption applies.

19            MR. OLESON:  I understand, your Honor.  First, I would

20    say it's not hypothetical.  There is law.  There is this

21    regulation that says this is an establishment base.  I've

22    looked at one --

23            THE COURT:  I've seen what the regulation says and to

24    me there's a question, at least, which will be litigated

25    undoubtedly, about how you apply that exemption to the facts of

1   this case.  But it's not clear to me just from looking at the

2   exemption that that defines the scope -- that your theory about

3   how the exemption applies defines the scope of permissible

4   discovery.

5            MR. OLESON:  I guess the other thing, your Honor, is

6   that, again, this idea of if they're at different locations,

7   does that change this analysis?  And does that open the door

8   for the plaintiffs here? which is what I think you're

9   suggesting.  There are rules and there's law about how you deal

10  with people who may be moving from one establishment to another

11  and how that may affect the analysis.

12           Plaintiffs obviously never raised that argument in

13  their response, so we'd be happy to provide you with

14  supplemental authority to explain how that happens.  But,

15  again, nothing-- and I've looked at these before-- nothing that

16  I'm aware of within that analysis would look at, again, the

17  general purpose or much less the job duties of a chief

18  executive officer and how those are relevant.  That's simply

19  not part of that equation, that legal equation.

20           THE COURT:  Okay.

21           MR. OLESON:  I guess the other kind of general

22  category that plaintiffs have referred to is the payroll data

23  for these individuals who work at the U.S. Open.  And, again,

24  their theory on this is --

25           THE COURT:  I'm sorry.  This is the --

```
 1              MR. OLESON:  The questionable interrogatory or the --

 2              THE COURT:  -- question of whether U.S.T.A. pays

 3    overtime and then to whom and, I guess, how much.

 4              MR. OLESON:  Correct.

 5              THE COURT:  Okay.

 6              MR. OLESON:  The first thing is, again, there's

 7    nothing in the statute, nothing in the law, nothing in the

 8    regulations that plaintiffs have pointed to that suggest that

 9    this is in any way relevant to those two statutory

10    requirements.  What are the receipts and what are the-- whether

11    this is a recreational use.  There's just no way, in my mind,

12    to connect whether somebody else is being paid overtime to

13    those two statutory issues.

14              The other point, I guess, your Honor, is that if

15    plaintiff's theory is that somehow the fact that we paid

16    overtime to these individuals is relevant, they have that

17    information.  It's certainly duplicative and overly burdensome

18    for us to have to provide every single detail of who was paid,

19    how much, when and where.  That has absolutely no relevance to

20    that argument.

21              THE COURT:  Okay.  Let's put aside for the moment

22    whether it has relevance and let's talk about burden, because

23    you're, I think, putting a couple of different things on the

24    table.

25              MR. OLESON:  Sure.
```

1              THE COURT:  What exactly is the burden?

2              MR. OLESON:  We asked the people at the U.S.T.A. to go

3      find who was paid overtime, how much, when.  The response we

4      got is that we would have to retain somebody additional.  It

5      would probably take a month or two.  We would have to go

6      through a number of paper documents that are in bankers' boxes

7      filed away to obtain that information.  And this goes both, I

8      think, to their document request and to the interrogatory

9      itself.

10             THE COURT:  There is a separate request for these

11     documents?

12             MR. OLESON:  Yes, your Honor.  It would be document

13     request numbers 10 and 19, I believe.

14             THE COURT:  Okay.  I think they did not ask for this

15     today.

16             MR. OLESON:  Okay.

17             THE COURT:  They just said if you could enforce

18     interrogatory number 1, that would be sufficient.

19             MR. OLESON:  But the interrogatory itself does ask for

20     all this minute detail about who was paid, how much and when,

21     and whether they worked overtime.

22             THE COURT:  Okay.

23             MR. OLESON:  I believe I've addressed the issues that

24     have been raised today with your Honor.  If there are other

25     issues that you'd like me to...

 1            THE COURT:  Well, there was a reference to minutes.

 2   I'm not sure, is that being contested?

 3            MR. OLESON:  For the same reasons as the board of

 4   directors' compensation or contracts, again, what may be

 5   discussed, what they may choose to write down at these meetings

 6   and on-line, you know, these general meetings of the U.S.T.A.,

 7   organizing other activities wholly unrelated to the U.S. Open,

 8   in our mind is irrelevant for the reasons we stated on the

 9   other issues.

10            THE COURT:  All right.  Anything else?

11            MR. OLESON:  Not unless you have something, your

12   Honor.

13            THE COURT:  Okay.

14            MR. KURTZ:  Judge, just to address a couple of

15   contentions, your Honor.  The idea that the U.S. Open might be

16   a separate establishment from the U.S.T.A., the contract that

17   plaintiffs signed are with the U.S.T.A.  And the U.S. Open is

18   not a defendant in this case, so I just wanted to dispose of

19   that.

20            And the same thing for the board of directors'

21   minutes.  The fact that they're talking about something other

22   than the U.S. Open, it's whether the U.S.T.A., the employer, is

23   an exempt recreational establishment.

24            That's all I have for now.  Thank you.

25            THE COURT:  I take it one of the arguments you're

```
 1    going to be making, if you haven't already made it, is that the
 2    U.S.T.A. is not an establishment as defined here because it's
 3    not a distinct physical place of business?
 4              MR. KURTZ:  No, that is not an argument that we have
 5    made.
 6              THE COURT:  Okay.
 7              MR. OLESON:  Your Honor, if I may.
 8              THE COURT:  Yes, sure.
 9              MR. OLESON:  On both the issue Mr. Kurtz raised and
10    the issue you raised.
11              THE COURT:  Yes.
12              MR. OLESON:  It's perfectly acceptable for an employer
13    to lease a premises, hold an event there, and that be
14    considered the establishment.  The example is, for instance,
15    the Texas State Fair.  The fairgrounds are not owned by the
16    state.  The state authority may lease the fairgrounds and hold
17    an event there once a year, those individuals.  That's the
18    relevant establishment, the Texas Fair State.
19              THE COURT:  Okay.  Let me go through this item by
20    item, but first I will note that, indicated during the course
21    of our colloquy, that while the defendant's assessment of how
22    the cited exemption will apply in this case may be correct, it
23    is not so conclusively correct as effectively to deprive the
24    plaintiffs of the right to pursue discovery relevant to their
25    theory of how the exemption should be applied.
```

1            Accordingly, the following is to be provided:  The

2     minutes of the board meetings, the minutes of the past

3     presidents meetings, the U.S.T.A.'s application for

4     not-for-profit status.

5            With respect to interrogatory 1, that is the inquiry

6     about the payment of overtime, the defendant will be permitted,

7     if it wishes, to make an evidentiary showing of burden.  That

8     showing is also to address the potential for narrowing the

9     scope of the request down, for example, to a listing of the

10    categories of employees of U.S.T.A. who are paid overtime as

11    distinguished from listing every single such employee and how

12    much each such employee was paid, which frankly seems to me

13    probably, if it's at all significantly burdensome, more of a

14    stretch and perhaps less justifiable than the somewhat more

15    fulsome description in the policy under which, in effect,

16    U.S.T.A. pays apparently some folks overtime and doesn't pay

17    others.

18            Also, that whole question of why U.S.T.A. pays some

19    people overtime and what the distinguishing characteristics are

20    is a matter that presumably could be addressed as well in

21    deposition if the plaintiffs were interested in doing so.

22            Let me just consult my notes for a moment.

23            I'm not inclined at this point to order production of

24    the contracts of executive directors and so I am not going to

25    enforce that now.  That's without prejudice if at some point

1    down the road there's a more compelling explanation of why

2    those are needed for purposes of analyzing the exemption at

3    issue.

4            Are there any other questions that we should deal with

5    at this point?

6            MR. OLESON:  Your Honor, may I just ask a point of

7    clarification?

8            THE COURT:  Yes.

9            MR. OLESON:  You're not ordering at this time that a

10   deposition would be proper as to the reasoning between whether

11   some people are paid overtime and others are not?

12           THE COURT:  I'm simply saying that the plaintiffs are

13   free to pursue a deposition if they want.

14           MR. OLESON:  Okay.  Because we do have-- our

15   understanding is that this phase of discovery is closed.  It

16   would be past the deadline.  I just want to make sure that we

17   have an opportunity to make de novo arguments at some point if

18   that issue is raised by them.  I don't know if they will raise

19   it.

20           THE COURT:  We will see.

21           MR. OLESON:  Okay.

22           THE COURT:  But in any event, the only other question

23   now is if you're intent upon making a burden argument, and

24   we're now at Tuesday, how long would it take you to put in

25   whatever you have to put in?

1          MR. OLESON:  I think the first step would be for us to

2     confer with plaintiffs and see if we can narrow it pursuant to

3     your suggestion.  If that fails, I guess -- the only thing that

4     gives me pause is the holidays.  I'm not sure who's still

5     around to make that statement.  My request would be three days

6     after the New Year or whatever.  But if that's too long for

7     your Honor, I can explore something else.

8          THE COURT:  No, that's fine.  That would take us to

9     the end of-- I guess the first week of January would be the

10    4th?

11         MR. OLESON:  I think that's correct, Judge.

12         THE COURT:  Why don't we target that as the date if

13    you need to make any such submissions.

14         MR. OLESON:  Thank you, your Honor.

15         THE COURT:  Anything else on plaintiffs' agenda?

16         MR. KURTZ:  Nothing further, your Honor.  Just to

17    avoid silence, we haven't said anything about a deposition, but

18    we reserve the option until we see the documents we're getting.

19         THE COURT:  Okay.

20         MR. OLESON:  Nothing further, your Honor.

21         THE COURT:  And I take it from what has been said,

22    you've done the discovery on the individual plaintiffs; you've

23    done the class cert discovery.  There still remains the

24    potential for additional discovery, assuming the case goes

25    forward past the class cert.  Is that correct?

1          MR. OLESON:  That's correct, your Honor.  The initial

2    case management order had a phased discovery process where we

3    went through these initial phases first.

4          THE COURT:  Thank you.

5          MR. OLESON:  Thank you, your Honor.

6          THE COURT:  Have a good holiday.

7          MR. KURTZ:  Thank you.  You, too.

8          MR. OLESON:  Thank you.

9          (Adjourned)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25