**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| STEVEN MEYER, MARC BELL, LARRY MULLIGAN-GIBBS and AIMEE JOHNSON, on behalf of themselves and all other similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> UNITED STATES TENNIS ASSOCIATION, <br><br> Defendant. | Civ. Action No. 11-CV-6268(ALC)(MHD) |

**DEFENDANT UNITED STATES TENNIS ASSOCIATION'S MEMORANDUM OF LAW**
**IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Richard J. Rabin
Kelly Brown
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
rrabin@akingump.com
kbrown@akingump.com

Nathan J. Oleson
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288
noleson@akingump.com

ATTORNEYS FOR DEFENDANT UNITED
STATES TENNIS ASSOCIATION

# TABLE OF CONTENTS

**Page**

Table of Authorities ........................................................................................... ii

PRELIMINARY STATEMENT ........................................................................ 1

FACTUAL BACKGROUND ............................................................................. 2

I.   PLAINTIFFS' WORK AS TENNIS UMPIRES ..................................... 2

II.  UMPIRES AT THE US OPEN ................................................................ 4

A.   The USTA and the US Open ......................................................... 4

B.   Plaintiffs' Work as Umpires at the US Open ............................... 5

1.   Selection of Umpires for the US Open .............................. 5

2.   Responsibilities of Officials at the US Open ..................... 6

3.   Officials' Compensation and Expenses at the US Open ............................ 8

ARGUMENT ...................................................................................................... 9

I.   STANDARD OF REVIEW .................................................................... 9

II.  PLAINTIFFS ARE INDEPENDENT CONTRACTORS AS A MATTER OF LAW ................................................................................ 10

A.   Plaintiffs Are Independent Contractors Under the FLSA .................................... 12

B.   Plaintiffs Are Independent Contractors Under the NYLL ..................... 15

III. PLAINTIFFS ARE EXEMPT FROM OVERTIME COMPENSATION UNDER THE SEASONAL EXEMPTION ................................. 16

A.   The US Open Meets The Requirements Of Section 13(a)(3) ............................ 17

1.   The US Open Is An "Amusement or Recreational" Establishment .......... 17

2.   The US Open Received The Vast Majority of Its Receipts In a Six Month Period ........................ 18

B.   The US Open Meets the Requirements for Seasonal Employees Under the NYLL ......................... 19

CONCLUSION .................................................................................................. 20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adams v. Detroit Tigers, Inc.,*
    961 F. Supp. 176 (E.D. Mich. 1997) ....................................................................... 18

*Alvarez-Perez v. Sanford-Orlando Kennel Club, Inc.*,
    515 F.3d 1150 (11th Cir. 2008) ............................................................................... 18

*Anderson v. Liberty Lobby, Inc*.,
    477 U.S. 242 (1986) ................................................................................................... 9

*Big East Conf.,*
    282 N.L.R.B. 335 (1986), *aff'd sub nom., Collegiate Basketball Officials Ass'n v.
    NLRB,* 836 F.2d 143 (3d Cir. 1987) ................................................................... 10, 11

*Bridewell v. Cincinnati Reds,*
    155 F.3d 828 (6th Cir. 1998) ............................................................................. 18, 19

*Brighton Sch. Dist. v. Lyons,*
    873 P.2d 26 (Colo. Ct. App. 1993) .................................................................... 10, 12

*Brock v. Louvers and Dampers, Inc.,*
    817 F.2d 1255 (6th Cir. 1987) ...................................................................... 17, 18, 19

*Brock v. Mr. W. Fireworks, Inc.,*
    814 F.2d 1042 (5th Cir. 1987) ................................................................................. 15

*Brock v. Superior Care, Inc.,*
    840 F.2d 1054 (2d Cir. 1988) ........................................................... 10, 11, 13, 15

*Byong v. Cipriani Grp., Inc.*,
    802 N.E.2d 1090 (N.Y. 2003) ....................................................................... 10, 11, 16

*DeBoissiere v. American Modification Agency,*
    No. 09-CV-2316 (JS)(MLO), 2010 WL 4340642 (E.D.N.Y. Oct. 22, 2010) ........... 11, 14, 16

*Doty v. Elias,*
    733 F.2d 720 (10th Cir. 1984) ................................................................................. 15

*Ehehalt v. Livingston Bd. of Educ.,*
    371 A.2d 752 (N.J. Super. Ct. App. Div. 1977) ............................................... 10, 12

*Farrar v. D.W. Daniel High Sch.,*
    424 S.E.2d 543 (S.C. Ct. App. 1992) .............................................................. 10, 12

*Gagen v. Kipany Prods., Ltd.,*
    812 N.Y.S.2d 689 (N.Y. App. Div. 2006) ...................................................................16

*Gale v. Greater Washington Softball Umpires Ass'n,*
    311 A.2d 817 (Md. Ct. Spec. App. 1973) ............................................................. 10, 12

*Godoy v. Restaurant Opportunity Ctr. of N.Y., Inc.,*
    615 F. Supp. 2d 186 (S.D.N.Y. 2009) .............................................................. 12, 14, 15

*Holtz v. Rockefeller & Co. Inc.,*
    258 F.3d 62 (2d Cir. 2001) .................................................................................................9

*Jeffery v. Sarasota White Sox, Inc.,*
    64 F.3d 590 (11th Cir. 1995) ......................................................................................17, 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ...........................................................................................................10

*McGuiggan v. CPC Int'l, Inc.,*
    84 F. Supp. 2d 470 (S.D.N.Y. 2000) ..............................................................................12

*O'Neil v. Blasdell High Sch.,*
    148 N.Y.S.2d 792 (N.Y. App. Div. 1956) ................................................................ 10, 12

*Velu v. Velocity Express, Inc.,*
    666 F. Supp. 2d 300 (E.D.N.Y. 2009) .............................................................................15

*Yonan v. United States Soccer Fed., Inc.,*
    833 F. Supp. 2d 882 (N.D. Ill. 2011) ....................................................................... passim

STATUTES

29 U.S.C.
    § 213(a)(3) ................................................................................................................... 17, 19

12 N.Y. Comp. of Codes, Rules, and Reg.
    § 142-2.2 .............................................................................................................................19

N.Y. Lab. Law
    § 652(1) (McKinney 2012) ..............................................................................................20

OTHER AUTHORITIES

29 C.F.R. § 553.32 .................................................................................................................19

29 C.F.R. § 779.23 .................................................................................................................17

29 C.F.R. § 779.310 ...............................................................................................................17

iii

29 C.F.R. § 779.311 ........................................................................................................17

29 C.F.R § 779.385 .........................................................................................................17

29 C.F.R. § 785.16 ..........................................................................................................20

Fed. R. Civ. P. 56(a)..........................................................................................................9

Fed. R. Civ. P. 56(c)..........................................................................................................1

Defendant United States Tennis Association ("USTA") hereby submits this memorandum of law in support of its motion for summary judgment on the claims of plaintiffs Steven Meyer, Marc Bell, Aimee Johnson, and Larry Mulligan-Gibbs and the class of individuals they purport to represent.

## PRELIMINARY STATEMENT

Plaintiffs are legal and business professionals who also, on occasion, officiate tennis matches at various local, college, professional, national, and international tournaments throughout the year.  In this lawsuit, they seek overtime compensation for time spent officiating matches at the US Open Tennis Championships ("US Open"), a tennis event staged annually by the USTA over a two-and-a-half week period in late August and early September.  The USTA seeks summary judgment on plaintiffs' claims pursuant to Fed. R. Civ. P. 56(c) for two reasons.

*First*, plaintiffs are not entitled to overtime under the Fair Labor Standards Act ("FLSA") or the New York Labor Law ("NYLL") because they are independent contractors.  Plaintiffs are highly-skilled officials that exercised virtually plenary authority over the calls made during their matches.  As tennis officials, they select the tournaments at which they will officiate, including the US Open, based on personal considerations such as locale, prestige, and their own professional and personal schedules.  They bear their own unreimbursed expenses and earn a profit (or loss) accordingly.  They claim independent contractor status when they report their US Open income and expenses on their tax returns, consistent with the independent contractor agreements they sign to provide officiating services at the US Open.  And their time at the US Open constitutes a fraction of their overall work as tennis officials, which is itself secondary to their primary careers as lawyers, executives, or business owners.  The "economic realities" surrounding plaintiffs' work thus establishes that they are independent contractors as a matter of law under the FLSA and NYLL.

*Second*, even if plaintiffs could claim they are employees of the USTA (which legal precedent establishes that they are not), plaintiffs' claims are precluded under Section 13(a)(3) of the FLSA and corresponding provisions of the NYLL's regulations.  These provisions exempt from overtime requirements any employee that works for a "recreation or amusement establishment" that takes in a substantial portion of its receipts during a six-month period. Sporting events such as the US Open indisputably qualify as "recreational or amusement" establishment under this section.  It also cannot be disputed that the vast majority—nearly 90 percent—of the USTA's receipts for the US Open are generated within a six-month period.  In fact, more than 80 percent of the USTA's *total* receipts are generated within the same six-month window.  Finally, plaintiffs cannot dispute that they were paid nearly double the minimum amount necessary to qualify for this exemption under the NYLL.  Summary judgment therefore should be entered on plaintiffs' claims in their entirety.

## FACTUAL BACKGROUND

### I.   PLAINTIFFS' WORK AS TENNIS UMPIRES

Plaintiffs Steven Meyer, Marc Bell, Aimee Johnson, and Larry Mulligan-Gibbs work primarily as lawyers, executives, or business managers.  (*See* Def. Statement of Material Facts ("Stmt. of Facts") ¶¶ 1-4.)  In addition to their primary careers as legal or business professionals, they officiate  tennis matches for various tennis associations, including the Association of Tennis Professionals ("ATP"), Women's Tennis Association ("WTA"), International Tennis Federation ("ITF"), Intercollegiate Tennis Association ("ITA"), and various national tennis associations including the USTA.  (*Id.* at ¶ 5.)

Plaintiffs fulfill a variety of roles as tennis umpires.  At smaller events, plaintiffs may serve as "roving officials" who oversee multiple matches and resolve disputes between players making their own line calls.  (Stmt. of Facts ¶ 6.)  At larger events, plaintiffs may serve as chair

or line umpires.  (*Id.*)  Line umpires make line calls and monitor player compliance with the

rules of tennis, which they may report to the chair umpire.  (*Id.* at ¶ 7.)  Line umpires' calls on

"questions of fact," such as whether a ball is in or out, cannot be overturned except by the chair

umpire.  (*Id.* at ¶ 8.)  Chair umpires are in charge of the match.  (*Id.* at ¶ 9.)  Their decisions on

"questions of fact" are final and cannot be reviewed.  (*Id.*)  Chair umpires also decide all

"questions of law" during a match, including determining whether a player should be penalized

for various conduct.  (*Id.*)

 Plaintiffs may obtain a variety of certifications as tennis officials.  (Stmt. of Facts ¶ 11.)

The USTA certifies officials as provisional, sectional, national, USTA, and professional.  (*Id.* at ¶

12.)  Provisional umpires are required to undergo a written test and meet certain visual acuity

requirements.  (*Id.*)  Subsequent USTA certification levels may be obtained by officiating a

certain number of matches and taking additional classes or certification tests.  (*Id.*)  Plaintiffs

also may pursue certification from other sanctioning bodies.  (*Id.* at ¶ 13.)  For example, tennis

umpires may obtain white, bronze, silver, and gold "badges" from the ITF after attending special

training sessions and taking written examinations offered by the Federation.  (*Id.*)

 Plaintiffs decide which tennis events to work based on factors such as the prestige and

location of the event, the compensation offered, and their professional and personal schedules.

(Stmt. of Facts ¶ 14.)  Plaintiffs sign individual independent contractor agreements with the

sanctioning body for each event and bear most of their expenses related to the tournament,

including travel, meals, and uniforms.  (*Id.* at ¶¶ 16, 18.)  Plaintiffs also incur a wide variety of

other expenses at their own discretion, including the costs of insurance, professional association

dues, office costs, and equipment.  (*Id.* at ¶ 17.)  The vast majority of events officiated by

plaintiffs each year are sanctioned by the ATP, WTA, ITF, or other bodies other than the USTA. (*Id.* at ¶ 15.)

Plaintiffs claimed independent contractor status for their tennis officiating on their tax returns throughout the relevant period.  (Stmt. of Facts ¶ 19.)  Their profit or loss from this work varied considerably.  (*Id.* at ¶ 20.)  For example, plaintiff Johnson recognized a profit only twice during the period 2005-2011.  (*Id.* at ¶ 21.)  Plaintiff Bell, by contrast, consistently earned several thousand dollars as a tennis umpire during the same period.  (*Id.* at ¶ 22.)  Several factors affected plaintiffs' profit or loss, including the number and type of events they worked each year, their own personal expenditures, and the compensation they could demand based on their certification level or badge status.  (*Id.* at ¶ 23.)

## II.   UMPIRES AT THE US OPEN

### A.   The USTA and the US Open

The USTA is a not-for-profit association organized under the laws of New York and headquartered in White Plains, New York.  (Stmt. of Facts ¶ 24.)  The USTA promotes the game of tennis in the United States through a variety of recreational and professional tennis programs. (*Id.* at ¶ 25.)  The USTA promotes tennis at a community level by sponsoring and conducting a variety of recreational tennis tournaments and providing other opportunities to play and practice the game of tennis.  (*Id.* at ¶ 26.)  It also promotes tennis by hosting or sponsoring various professional tennis events that are open to the general public.  (*Id.*)

The US Open is the USTA's signature event and one of the four "Grand Slam" tournaments.  (*See generally* Dkt. No. 1, ¶ 2.)  The tournament is held each year for a period of just over three weeks in late August through early September at the USTA Billie Jean King National Tennis Center ("National Tennis Center") in Queens, New York.  (*Id.*; *see also* Stmt. of

Facts ¶ 27.)  The tournament attracts hundreds of thousands of spectators to watch men's and women's matches, junior matches, and wheelchair tennis matches.  (Stmt. of Facts ¶ 28.)

The USTA operates the US Open through its "Professional Tennis" arm, which is responsible for the US Open and a handful of other professional tournaments that take place prior to the Open.  (Dkt. No. 1, ¶ 12.)  The USTA generates a substantial amount of its annual income—in excess of 80 percent—from the US Open.  (Stmt. of Facts ¶ 30.)  Because of the seasonal nature of the US Open, receipt of this income is concentrated between the months of June-September.  (*Id.*)   In all, approximately 85 percent of US Open receipts are received over a six-month period, and the average receipts during the remaining six months are typically between 9-21 percent of the average receipts from the US Open's higher-income months.  (*Id.* at ¶ 31.)  Due to the close correlation between the USTA's overall income and income from the US Open, the USTA's receipts are similarly concentrated.  (*Id.*)

**B.**   **Plaintiffs' Work as Umpires at the US Open**

**1.**   **Selection of Umpires for the US Open**

The USTA retains umpires to officiate the Open from a variety of sources.  (Stmt. of Facts ¶ 33.)  Some umpires are residents of the United States and certified by the USTA at the provisional level or above.  (*Id.* at ¶ 34.)  Other umpires are recommended by the national tennis associations of other countries, and have little or no history of officiating in the United States.  (*Id.* at ¶ 35.)  Still other umpires are supplied by other sanctioning bodies such as the ATP and ITF under agreements between these federations and the USTA. (*Id.* at ¶ 36.)

USTA-certified officials such as plaintiffs may submit applications to officiate at the US Open.  (Stmt. of Facts ¶ 37.)  In their applications, plaintiffs identify the days or weeks they are willing to make themselves available to officiate matches.  (*Id.*)  Some USTA-certified officials only officiate matches for the four days of "qualifying" matches played during the first week of

the Open.  (*Id.* at ¶ 38.)  Other officials only make themselves available during the "main draw"

through the end of the tournament.  (*Id.*)  Umpires also may identify certain days on which they

will not work for personal, professional, or other reasons.  (*Id.* at ¶ 39.)  The decision whether to

seek an assignment at the US Open during any particular year also initiates with the umpires

themselves—plaintiffs applied to work many of the US Opens during the relevant period, but did

not apply to work certain years for personal or professional reasons.  (*Id.* at ¶ 40.)

   Any USTA-certified umpire is eligible to be retained by the USTA to officiate matches at

the US Open, regardless of certification level.  (Stmt. of Facts ¶ 41.)  Umpires from outside the

United States who are not certified by the USTA may also be retained to officiate at the Open.

(*Id.* at ¶ 42.)  A US Open selection committee reviews all applicants and identifies the most

qualified umpires based upon various criteria, including their application, certification level,

officiating experience, and performance at various tournaments throughout the year.  (*Id.* at ¶

43.)  Acceptance and rejection letters are then sent to officials notifying them of their selection.

(*Id.*)  An individual selected to officiate at the US Open may choose to accept or decline this

offer.  (*Id.* at ¶ 44.)

### 2.    Responsibilities of Officials at the US Open

   Plaintiffs served as both line and chair umpires during the US Open.   (Stmt. of Facts ¶

45.)  As line umpires, plaintiffs operated in a variety of configurations and worked a schedule of

one-hour-on, one-hour-off at a specified court for all or part of the day.  (*Id.* at ¶ 46.)  Plaintiffs

made line calls on issues such as whether struck balls were in or out or whether a foot fault

occurred.  (*Id.* at ¶ 47.)  They also monitored compliance with the rules of tennis and reported

observed violations to the chair umpire.  (*Id.*)  Plaintiffs were required to exercise the type of

discretion typical of other sports officials when calling matches.  (*Id.* at ¶ 48.)  For example,

plaintiffs may not always call a foot fault even if a technical violation of the rule occurred, so

long as the player was not gaining an advantage and they applied their ruling evenly.  (*Id.*)  As at other tennis tournaments, plaintiffs' calls as line umpires on "questions of fact" could be overturned only by the chair umpire, and were not subject to review by the USTA or the US Open's referee.  (*Id.* at ¶ 49.)

As chair umpires at the US Open, plaintiffs exercised additional authority beyond that exercised by line officials.  (Stmt. of Facts ¶ 50.)  Chair umpires had ultimate authority to call or resolve "questions of fact"—determining whether a ball was in or out, or whether a player threw a racquet or uttered an obscenity—subject only to the limited number of challenges players are permitted to make each match to review line calls with the US Open's "Hawkeye" electronic line calling system.  (*Id.*)  Chair umpires also determined "questions of law"—judgment calls that required an interpretation of the rules of tennis—such as whether a player's conduct merited a warning or penalty.  (*Id.* at ¶ 51.)  Chair umpires also possessed the authority to suspend matches because of weather conditions.  (*Id.* at ¶ 52.)  Although a US Open referee could hear appeals of a chair umpire's decision on a question of law at the request of a player, appeals are rarely made and the chair umpire's decision is almost never overturned.  (*Id.* at ¶ 53.)  Unlike the hour-on, hour-off schedule followed by line umpires, chair umpires officiated particular matches at the US Open through their conclusion, and thus frequently had downtime between matches to rest in the umpires' lounge, play cards, watch other matches, or evaluate line umpires.  (*Id* at ¶ 54.)

Officials are assigned to officiate at specific matches at the US Open by the USTA. (Stmt. of Facts ¶ 55.)  Assignments are made based on a variety of factors, including the official's badge or certification level and overall performance during the tournament.  (*Id.*)  To preserve the independence of officials, the USTA also ensures that chair umpires are not assigned

to officiate matches involving a player of the same nationality, or where there is a history of disputes between the official and player.  (*Id.* at ¶ 56.)

The total number of days or matches officiated by an individual during the US Open varies based on the needs of the US Open and the availability indicated by individual official. (Stmt. of Facts ¶ 57.)  The number of hours on-court also varies.  (*Id.* at ¶ 58.)  Plaintiffs typically were required by the USTA to be at the National Tennis Center by 10:00 a.m. each day they were scheduled to officiate matches.  (*Id.* at ¶ 59.)  Plaintiffs allege they typically were at the National Tennis Center for 10-11 hours per day during the tournament, although they admit that this estimate includes travel time to and from the National Tennis Center; time they were at the National Tennis Center before they were required to report; and downtime, meal breaks, and other time off that they had throughout the day.  (*Id.* at ¶ 60.)

### 3.    Officials' Compensation and Expenses at the US Open

All officials selected to officiate the US Open sign independent contractor agreements with the USTA for each US Open during which they decide to supply their services.  (Stmt. of Facts ¶ 61.)  Officials that sign such agreements are paid a daily rate based upon their USTA or ITF certification level.  (*Id.* at ¶ 62.)  They also receive a $40 per diem for each day they do not officiate matches.  (*Id.*)  During the relevant period, plaintiffs earned between $115-200 per day as officials at the US Open.  (*Id.* at ¶ 63.)

The USTA pays certain travel, meal, and equipment costs for officials at the US Open, including the costs of airfare to the tournament, hotel expenses at the InterContinental Hotel or Sheraton Manhattan Midtown, a meal credit of $20-25 per day for use at the National Tennis Center, and uniforms worn while officiating matches at the tournament.  (Stmt. of Facts ¶ 64.) However, plaintiffs could (and did) incur a variety of additional expenses that were not reimbursed by the USTA.  (*Id.* at ¶ 65.)  For example, plaintiffs paid for their travel expenses to

and from their local airport, to and from the airport to their hotel in New York City, and to the

National Tennis Center if they chose to take the subway or other forms of local transportation not

provided by the USTA.  (*Id.*)  They also could spend extra to obtain a single hotel room and paid

any meal expenses not covered by their $20-25 per day stipend.  (*Id.*)  In addition to these travel

and meal expenses, plaintiffs paid for their own eyewear, sunblock, timer/watch, tape measure,

and other necessary equipment beyond their tournament uniforms.  (*Id.* at ¶ 66.)  The extent to

which plaintiffs incurred these expenses varied.  (*Id.* at ¶ 67.)  Plaintiffs reported these additional

expenses, as well as their umpiring income from the US Open, as independent contractor income

and expenses on their tax returns.  (*Id.* at ¶ 68.)

## ARGUMENT

## I.    STANDARD OF REVIEW

Summary judgment is proper "if the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a).  "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat

an otherwise properly supported motion for summary judgment; the requirement is that there be

no *genuine* issue of *material* fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)

(emphasis in original).  A fact is considered material to summary judgment "if it 'might affect the

outcome of the suit under the governing law,'" and a factual dispute is genuine where "'the

evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  *Holtz v.*

*Rockefeller & Co. Inc.*, 258 F.3d 62, 69 (2d Cir. 2001) (quoting *Anderson*, 477 U.S. at 248).

Summary judgment cannot be defeated by "simply show[ing] that there is some metaphysical

doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574,

586 (1986).

## II.   PLAINTIFFS ARE INDEPENDENT CONTRACTORS AS A MATTER OF LAW

Plaintiffs' claims fail as a matter of law because they are independent contractors under the FLSA and NYLL, and thus not entitled to overtime compensation.  *See, e.g., Brock v. Superior Care, Inc.,* 840 F.2d 1054, 1058-59 (2d Cir. 1988) (independent contractors are not covered by FLSA's overtime provisions); *Byong v. Cipriani Grp., Inc.*, 802 N.E.2d 1090, 1093 (N.Y. 2003) (independent contractors are not covered by requirements of NYLL).  This conclusion is consistent with a long line of court decisions finding officials in other sports to be independent contractors as a matter of law.  *See Yonan v. United States Soccer Fed., Inc.,* 833 F. Supp. 2d 882 (N.D. Ill. 2011) (soccer official); *Big East Conf.,* 282 N.L.R.B. 335 (1986), *aff'd sub nom., Collegiate Basketball Officials Ass'n v. NLRB,* 836 F.2d 143 (3d Cir. 1987) (college basketball referees); *O'Neil v. Blasdell High Sch.,* 148 N.Y.S.2d 792 (N.Y. App. Div. 1956) (high school football referee); *Brighton Sch. Dist. v. Lyons,* 873 P.2d 26 (Colo. Ct. App. 1993) (high school sports official); *Farrar v. D.W. Daniel High Sch.,* 424 S.E.2d 543 (S.C. Ct. App. 1992) (high school football official); *Ehehalt v. Livingston Bd. of Educ.,* 371 A.2d 752 (N.J. Super. Ct. App. Div. 1977) (basketball official); *Gale v. Greater Washington Softball Umpires Ass'n,* 311 A.2d 817 (Md. Ct. Spec. App. 1973) (softball umpire).

The determination of whether an employment relationship exists under the FLSA is based on the "economic realities" of the relationship.  *See, e.g., Superior Care,* 840 F.2d at 1058-59.  Factors relevant to this determination include (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit and loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.  *Id.*   However, these factors "are not exclusive" and "any relevant evidence may be considered."  *Id.* at 1059.  Under the NYLL, factors include

whether the person (1) worked at their convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll, and (5) was on a fixed schedule. *Byong*, 802 N.E.2d at 1093.  Under New York law, "it [also] is a 'significant consideration' if the person classifies himself or herself as an independent contractor for income tax purposes." *DeBoissiere v. American Modification Agency*, No. 09-CV-2316 (JS)(MLO), 2010 WL 4340642, at *3 (E.D.N.Y. Oct. 22, 2010).

The facts clearly demonstrate that plaintiffs are independent contractors under these standards.  Indeed, they are virtually indistinguishable from the soccer official found to be an independent contractor under the "economic realities" test in *Yonan*.  Like the soccer official in *Yonan,* plaintiffs exercise considerable skill and discretion in officiating sporting matches. *Yonan,* 833 F. Supp. 2d at 890.  They determine their profit or loss based on their investment in their business and the revenue they can generate is based on their certification level and the number of tournaments they officiate.  *Id.* at 891.  They maintain officiating relationships with multiple federations, do not work exclusively with any one entity or tournament, and thus are not economically dependent upon any of these institutions.  *Id.* at 891-92.  And they repeatedly confirmed their status under oath to the federal government when they reported their officiating income as independent contractors.  *Id.* at 891.  Under similar facts, courts and the National Labor Relations Board have repeatedly held that sports officials work as independent contractors rather than employees.  *Id.*; *see also Big East Conf.,* 282 N.L.R.B. at 335 (1986) (college basketball referees); *O'Neil,* 148 N.Y.S.2d at 792 (high school football referee); *Lyons,* 873 P.2d at 26 (high school sports official); *Farrar,* 424 S.E.2d at 543 (high school football official); *Ehehalt,* 371 A.2d at 752 (basketball official); *Gale,* 311 A.2d at 817 (softball umpire).  Like

these other officials, plaintiffs cannot avoid the conclusion that they are independent contractors as a matter of law.

### A.   Plaintiffs Are Independent Contractors Under the FLSA

The "'ultimate concern' of a court's 'economic reality' inquiry is the economic dependence of the putative employee on the putative employer." *Godoy v. Restaurant Opportunity Ctr. of N.Y., Inc.,* 615 F. Supp. 2d 186, 193 (S.D.N.Y. 2009); *see also, e.g., McGuiggan v. CPC Int'l, Inc.*, 84 F. Supp. 2d 470, 479-80 (S.D.N.Y. 2000) (the "economic realities" test asks whether the plaintiff is "economically dependent on and within the direct control" of the principal).  The economic reality here is that plaintiffs contracted to perform services for the USTA as independent contractors, and not employees.

*First*, the USTA exerts virtually no control over the core function of umpires at the US Open, which plaintiffs readily admit requires substantial skill.  (Stmt. of Facts ¶ 10.)  Plaintiffs' factual determinations as tennis umpires—whether a ball was in or out, whether or not a foot fault occurred, whether certain acts occurred that may merit a penalty under the rules of tennis— were completely within their discretion and could not be overturned by the USTA.  (Stmt. of Facts ¶¶ 47-53.)  Determinations on "questions of law"—whether a particular act should be penalized—also were free from review by the USTA except in very limited circumstances.  (*Id.*)  Plaintiffs admit that making these determinations involves the exercise of discretion.  (*Id.*)  They also concede that effectively umpiring a match demands considerable skill.  (*Id.* at 10.)  The fact that plaintiffs "call[ed] the game as [they] saw fit" and exercised "a great deal of skill" in doing so thus supports independent contractor status.  *Yonan,* 833 F. Supp. 2d at 890.

*Second*, there is no dispute that plaintiffs invested in their business as tennis officials and could affect their opportunity for profit or loss.  Plaintiffs invested tens of thousands of dollars each year in officiating.  (Stmt. of Facts ¶ 20.)  In some cases, this investment yielded a

meaningful profit.  (*Id.* at ¶ 22.)  In others, it did not.  (*Id.* at ¶ 21.)  Plaintiffs' own decisions, including those they made regarding the US Open, determined the degree to which their officiating enterprise was profitable or unprofitable.  This factor thus also demonstrates independent contractor status.  *See, e.g., Yonan,* 833 F. Supp. 2d at 891 (responsibility of referee for various costs demonstrates independent contractor status).

*Third,* plaintiffs' relationship with the US Open was limited in duration and was a small percentage of their broader work as tennis officials, which was itself secondary to their primary careers as lawyers, executives, or business owners.  Plaintiffs typically worked 16 days or less each year at the US Open.  (Stmt. of Facts ¶ 69.)  Their work at the US Open generally was less than 10 percent of their overall work as tennis umpires in a typical year.  (*Id.* at ¶ 70.)  Plaintiffs' decision whether to seek work at the US Open was based on their own circumstances (both personal and professional), and they were free to decline to work the US Open altogether if they considered the pay insufficient, preferred to work other tournaments, or had other personal or professional commitments.  (*Id.* at ¶¶ 14, 37-40, 44.)  The "permanence of the working relationship" factor thus favors independent contractor status.  *Superior Care,* 840 F.2d at 1060-61; *Yonan,* 833 F. Supp. 2d at 891-92.

*Fourth,* other factors demonstrate that plaintiffs were independent from the US Open as a matter of economic reality.  *Superior Care,* 840 F.2d at 1059 ("economic reality" factors "are not exclusive" and "any relevant evidence may be considered"); *Godoy,* 615 F. Supp. 2d at 193 ("ultimate concern" of inquiry is "the economic dependence of the putative employee on the putative employer").  Plaintiffs are lawyers and business people that spend the vast majority of their working time on professional pursuits completely unrelated to the officiating of tennis.  (Stmt. of Facts ¶¶ 1-4.)  They do not depend upon income from tennis umpiring to make a

living—indeed, their umpiring activities sometimes resulted in a net loss. (*Id.* at ¶¶ 20, 21.)  Nor are they financially dependent upon the US Open.  Plaintiffs officiated most of their matches as independent contractors for the ATP, WTA, ITF, and other sanctioning bodies.  (*Id.* at ¶¶ 15, 19.)  Plaintiffs thus were not "economically dependent" on the US Open, either for their livelihood or for opportunities to officiate matches as a tennis umpire. [1]

*Finally,* the fact that plaintiffs claimed the advantages of independent contractor status when reporting their US Open income and expenses on their tax returns also demonstrates that, as a matter of economic reality, plaintiffs were independent contractors.  *See, e.g., Yonan,* 833 F. Supp. 2d at 891 ("The Court cannot ignore the admissions" in tax returns when determining independent contractor status); *cf. DeBoissier,* 2010 WL 4340642, at *3 ("[T]hough not quite rising to the level of estoppel, if a plaintiff signs a tax return 'under penalty of perjury' that declares independent contractor status… such a tax return may significantly impede the plaintiff's ability to claim employee status for purposes of filing an overtime or minimum wage claim [under NYLL].").  Plaintiffs are sophisticated professionals that were fully aware of the distinction between independent contractor and employee status.  (*See* Stmt. of Facts ¶¶ 1-4, 19.)  Their decision to classify themselves as the former in their filings with the federal government further supports the conclusion that they are independent contractors.  *Yonan,* 833 F. Supp. 2d at 891.

Plaintiffs thus are not the type of workers that "depend upon someone else's business for the opportunity to render service."  *Superior Care,* 840 F.2d at 1059.  Rather, they are

---

[1] The fifth factor, the extent to which plaintiffs' work was integral to the USTA's business, is neutral.  While the USTA seeks the most qualified umpires to officiate matches at the US Open in a variety of positions, plaintiffs admit that tennis tournaments can be (and are) conducted without chair and line umpires.  (Stmt. of Facts ¶ 71.)

sophisticated professionals that are "in business for themselves" as tennis umpires, deciding which tournaments to officiate based on prestige and locale and taking advantage of the additional tax benefits they can recognize by working these events as independent contractors. They are in no sense economically dependent upon the US Open, and thus are independent contractors as a matter of law. *Godoy,* 615 F. Supp. 2d at 193; *see also, e.g., Doty v. Elias,* 733 F.2d 720, 722-23 (10th Cir. 1984) ("The focal point in deciding whether an individual is an employee is whether the individual is economically dependent on the business to which he renders service…."); *Brock v. Mr. W. Fireworks, Inc.,* 814 F.2d 1042, 1044 (5th Cir. 1987) ("The five tests are aids—tools to be used to gauge the degree of dependence of the alleged employees on the business with which they are connected.  It is *dependence* that indicates employee status.").

**B.     Plaintiffs Are Independent Contractors Under the NYLL**

"Although slightly different from the FLSA inquiry, the standard for determining a worker's status as an employee or independent contractor under New York State Labor Law is similar, and accounts for some of the same factors." *Velu v. Velocity Express, Inc.,* 666 F. Supp. 2d 300, 306-07 (E.D.N.Y. 2009).  As shown above, plaintiffs are independent contractors under the factors used to assess such status under the FLSA.  The additional factors considered under the NYLL—whether plaintiffs (1) worked at their convenience, (2) were free to engage in other employment, (3) received fringe benefits, (4) were on the employer's payroll, (5) were on a fixed schedule, and (6) claimed independent contractor status on their tax returns, *Byong*, 802 N.E.2d at 1093; *DeBoissiere,* 2010 WL 4340642, at *3—also demonstrate independent contractor status.

As noted above, plaintiffs determined whether or not they wished to officiate at the US Open each year, and could (and did) indicate restrictions on their availability during the event. (Stmt. of Facts ¶¶ 14, 37-40, 44.)  They thus "worked at their convenience," because they were

not required to officiate at the US Open.  *Byong,* 802 N.E.2d at 1093.  They also indisputably were (1) free to engage in other employment, (2) did not receive fringe benefits, and (3) were not "on the employer's payroll."  *Id.*; (Stmt. of Facts ¶ 1-4, 65, 66.)  Finally, they repeatedly claimed independent contractor status on their tax returns, a "significant consideration" in whether they may claim to be employees under the NYLL.  *Gagen v. Kipany Prods., Ltd.,* 812 N.Y.S.2d 689, 691 (N.Y. App. Div. 2006); *see also DeBoissiere,* 2010 WL 4340642, at *3 ("[T]hough not quite rising to the level of estoppel, if a plaintiff signs a tax return 'under penalty of perjury' that declares independent contractor status… such a tax return may significantly impede the plaintiff's ability to claim employee status for purposes of filing an overtime or minimum wage claim [under NYLL].").  Plaintiffs thus were properly classified as independent contractors under the NYLL and FLSA as a matter of law.

## III.   PLAINTIFFS ARE EXEMPT FROM OVERTIME COMPENSATION UNDER THE SEASONAL EXEMPTION

Even if plaintiffs were not independent contractors, their claims would fail because they would qualify as exempt "seasonal" employees under Section 13(a)(3) of the FLSA and corresponding NYLL regulations.  Under this provision, employees are exempt from the minimum wage and overtime requirements of the FLSA if they are "employed by… an amusement or recreational establishment" that either "does not operate for more than seven months in any calendar year, or… during the preceding calendar year, its average receipts for any six months of such year were not more than 33 1/3 per centum of its average receipts for the other six months of such year…."  29 U.S.C. § 213(a)(3).  "The logical purpose of the provision is to exempt the type of amusement and recreation enterprises…, which by their nature, have very sharp peak and slack seasons."  *Brock v. Louvers and Dampers, Inc.,* 817 F.2d 1255, 1259 (6th Cir. 1987).  Plaintiffs clearly fall within this exemption.

**A.** **The US Open Meets The Requirements Of Section 13(a)(3)**

**1.** **The US Open Is An "Amusement or Recreational" Establishment**

There can be no dispute that the US Open is a recreational or amusement establishment. Establishments qualify as exempt if they are "frequented by the public for its amusement or recreation."  29 C.F.R § 779.385.  An employer need not provide "amusement or recreation" at all of its facilities to qualify for the exemption.  *See, e.g.,* 29 C.F.R. § 779.310 (operators of multi-unit operations qualify for exemption only at those establishments that satisfy requirements of the exemption).  This is because an "establishment" is "a 'distinct physical place of business' rather than [] 'an entire business or enterprise' which may include several separate places of business."  29 C.F.R. § 779.23.  Only the distinct physical location at which an employee works need qualify for the exemption to apply.  *See, e.g.,* 29 C.F.R. § 779.311 ("An employee who is employed by an establishment which qualifies as an exempt establishment… is exempt from the minimum wage and overtime requirements of the Act even though his employer also operates one or more establishments which are not exempt.").

"'Sports events' are among those types of recreational activities specifically considered by Congress to be covered by the exemption."  *See Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 595 (11th Cir. 1995) (citing H.R. Rep. No. 871, 89th Cong., 1st Sess. 35 (1965)). Consistent with this legislative purpose, spectator sporting events like the US Open have repeatedly been held to qualify as "amusement or recreation" establishments for purposes of the FLSA.  *Jeffery,* 64 F.3d at 595 (minor league baseball team meets "amusement or recreation" requirement); *Alvarez-Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1156 (11th Cir. 2008) ("[n]o one questions that [race tracks] are in the recreation or amusement business"); *Louvers and Dampers*, 817 F.2d at 1255 (golf club meets "amusement or recreation" requirement); *Bridewell v. Cincinnati Reds*, 155 F.3d 828, 829 (6th Cir. 1998) (professional

17

baseball team meets "amusement or recreation" requirement); *Adams v. Detroit Tigers, Inc.,* 961 F. Supp. 176, 178-79 (E.D. Mich. 1997) (professional baseball team meets "amusement or recreation" requirement).

As plaintiffs admit in their complaint, the US Open is one of tennis' premier sporting events, drawing hundreds of thousands of spectators each year. (Dkt. No. 1 ¶ 2; *see also* Stmt. of Facts ¶ 28.) These spectators watch hundreds of tennis matches played by professional and amateur tennis players over a three week period at the National Tennis Center in Queens. (Stmt. of Facts ¶ 27.) As a spectator sporting event, the US Open clearly qualifies as an "amusement or recreational establishment" under Section 13(a)(3). *See, e.g., Jeffrey*, 64 F.3d at 595 ("'Sports events' are among those types of recreational activities specifically considered by Congress to be covered by the exemption."); *Adams,* 961 F. Supp. at 179 (holding that "[m]ajor-league baseball teams may properly be considered 'recreational' establishments, or establishments designed for 'amusement'").

**2.    The US Open Received The Vast Majority of Its Receipts In a Six Month Period**

The US Open also meets Section 213(a)(3)'s receipts test. For purposes of the exemption, "receipts" are calculated based on when income was received by the establishment, rather than when it "accrued" for accounting purposes. *Bridewell,* 155 F.3d at 830. The receipts test is met if the establishment's receipts for the lowest six months are no more than one-third the average receipts for the highest six months. 29 U.S.C. § 213(a)(3).

When calculated on this basis, the vast majority of the US Open's receipts— approximately 85 percent—are received within a six month period.[2] (Stmt. of Facts ¶ 31.)

---

[2] Section 213(a)(3) requires an analysis of the six months in which receipts were highest, regardless of whether these months are consecutive. *See, e.g.,* 29 C.F.R. § 553.32.

Consequently, the average receipts of the lowest six months of each calendar year during the relevant period were far below 33 1/3 percent of the US Open's average receipts during the highest six months of each year.  (*Id.* (average receipts from six lowest months between 9-21 percent of average receipts from six highest months).)  The US Open thus is a paradigmatic example of "the type of amusement and recreation enterprises…, which by their nature, have very sharp peak and slack seasons." *Louvers and Dampers,* 817 F.2d at 1259.  Because the US Open meets both of the requirements of Section 13(a)(3), plaintiffs would be exempt from the overtime requirements of the FLSA even if they were classified as employees.

**B.    The US Open Meets the Requirements for Seasonal Employees Under the NYLL**

The overtime requirements of the NYLL are "subject to the exemptions of section 7 and 13 of 29 U.S.C. 201, *et seq.*"  *See* 12 N.Y. Comp. of Codes, Rules, and Reg. § 142-2.2.  Plaintiffs thus are exempt under the NYLL if they meet the requirements of Section 13(a)(3) and satisfy the additional requirement in the NYLL's regulations that employees exempt under these sections are paid an amount at least equal to "overtime at a wage rate of 1½ times the basic minimum hourly rate."  *See* 12 N.Y. Comp. of Codes, Rules, and Reg. § 142-2.2.

Plaintiffs' compensation easily satisfies this additional requirement.  The NYLL minimum wage rate ranged from $6.75-7.25 during the relevant period.  *See* N.Y. Lab. Law § 652(1) (McKinney 2012).[3]  Plaintiffs thus were required to be paid $270-290 per week for their first 40 hours of work, and at least $10.13-10.88 for any hours thereafter.  Plaintiffs were paid far in excess of these minimum amounts.  They received between $115-200 *per day* during the

_____

[3] Plaintiffs' filed their complaint on September 8, 2011.  Based on the NYLL's six year statute of limitations, plaintiffs cannot seek recovery for claims prior September 8, 2005. Because none of the plaintiffs claimed to have officiated any matches between September 8 and the conclusion of the 2005 US Open on September 11, plaintiffs have no claims for this period and the $6.00/hour minimum wage in effect during 2005 does not apply.

relevant period, and thus earned at least $575-1,000 for five days of work.  (Stmt. of Facts ¶ 63.)

Even assuming that plaintiffs worked 10-11 hours per day, the NYLL would require that they be

paid only $421.95-453.20 for that same period to qualify for the exemption.[4]  Because plaintiffs

were instead paid up to twice the amount required by the NYLL, they also meet the requirements

for exempt "amusement or recreational" employees under the NYLL.

## CONCLUSION

For the foregoing reasons, the Court should enter summary judgment in favor of

defendant United States Tennis Association on plaintiffs' claims in their entirety.

Respectfully submitted,

DATED: November 15, 2013                    _____/s/ Nathan J. Oleson_____

Richard J. Rabin
AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002
rrabin@akingump.com

Nathan J. Oleson
AKIN GUMP STRAUSS HAUER & FELD LLP
1333 New Hampshire Avenue
Washington, DC 20036
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

---

[4] The undisputed facts show that this estimate includes non-compensable time spent traveling to and from the US Open, downtime prior to the start of matches for the day, and break time in between matches.  (Stmt. of Facts ¶ 60.)  This time is not compensable under the FLSA. *See, e.g.,* 29 C.F.R. § 785.16 ("Periods during which an employee is completely relieved from duty and which are long enough to enable him to use the time effectively for his own purposes are not hours worked"); § 785.19 ("*Bona fide* meal periods are not compensable time"); § 785.35 ("Normal travel from home to work is not worktime").  Thus, the actual compensable time for which plaintiffs would be required to be compensated at the regulatory rate is substantially lower than 10-11 hours per day.

noleson@akingump.com

ATTORNEYS FOR DEFENDANT
UNITED STATES TENNIS ASSOCIATION

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Memorandum of Law in Support of Defendant United States Tennis Association's Motion for Summary Judgment was served this 15th day of November, 2013 via the ECF filing system (registered users) or via U.S. Mail on the following:

Judith L. Spanier, Esq.
ABBEY SPANIER RODD & ABRAMS, LLP
212 East 39th Street
New York, NY 10016

Mitchell Schley, Esq.
LAW OFFICES OF MITCHELL SCHLEY, LLC
245 Park Avenue, 24th Floor
New York, NY 10167

_____ */s/ Nathan J. Oleson*_____
Nathan J. Oleson

22