UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
STEVEN MEYER, MARC BELL, LARRY :
MULLIGAN-GIBBS and AIMEE JOHNSON, :
on behalf of themselves and all others :
similarly situated, :
: 1:11-cv-06268 (ALC) (MHD)
Plaintiffs, :
: **OPINION AND ORDER**
-against- :
:
UNITED STATES TENNIS ASSOCIATION, :
:
Defendant. :
------------------------------------------------------------x

**ANDREW L. CARTER, JR., United States District Judge:**

Plaintiffs Steven Meyer, Marc Bell, Larry Mulligan-Gibbs and Aimee Johnson ("Plaintiffs"), individually and on behalf of all others similarly situated, brought this case against Defendant United States Tennis Association ("USTA" or "Defendant") for violating the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* ("FLSA"), and New York Labor Law ("NYLL"). Plaintiffs assert that Defendants failed to compensate its tennis umpires for any hours worked in excess of forty hours per week. This Court granted Plaintiffs' Motion for Class Certification (ECF No. 84, superseded by ECF No. 372) on April 25, 2013. After extensive class certification and merits discovery, both parties have moved for summary judgment. For the reasons that follow, Defendant's Motion for Summary Judgment (ECF No. 364) is GRANTED, and Plaintiff's Cross-Motion for Summary Judgment (ECF No. 380) is DENIED.

**I. Factual Background**

Plaintiffs Meyer, Bell, Johnson, and Mulligan-Gibbs work as umpires during the US Open. Plaintiffs also work as umpires for other tennis associations, including the Association of Tennis Professionals, Women's Tennis Association, International Tennis Federation,

1

Intercollegiate Tennis Association, and various national tennis associations. (Def.'s 56.1 ¶ 5, ECF No. 366). In addition to working as tennis umpires during the class period, some Plaintiffs also worked as lawyers, executives, or business managers for at least part of that period. (Id. ¶¶ 1-4). For instance, Plaintiff Johnson "worked part time as a District Attorney in Louisiana" (Pls.' 56.1 ¶ 74, ECF No. 382); Plaintiff Meyer is an attorney in private practice (Def's 56.1 ¶ 1); and Plaintiff Gibbs is an executive with GlaxoSmithKline (Id. ¶ 4).

Defendant USTA is a not-for-profit tennis organization. (Id. ¶ 24; Pls.' 56.1 ¶ 75). Defendant promotes tennis in the United States through various recreational and professional tennis programs. (Def.'s 56.1 ¶ 25). "It promotes tennis at a community level by sponsoring and conducting a variety of recreational tennis tournaments and providing other opportunity to play and practice the game of tennis." (Id. ¶ 26). "It also promotes tennis by sponsoring various professional spectator tennis events that are open to the general public." (Id.). One such spectator tennis event that Defendant owns and operates is the US Open. (Pls.' 56.1 ¶¶ 76-77).

The US Open is Defendant's signature event and one of the four "Grand Slam" tournaments. (See Compl. ¶ 2, ECF No. 1). The annual tournament takes place over a period of three weeks in late August and early September at the USTA Billie Jean King National Tennis Center in Queens, New York. (Id.; Def.'s 56.1 ¶ 27). Thousands of spectators come to watch men's and women's matches, juniors' matches, and wheelchair tennis matches. (Def.'s 56.1 ¶ 28). The first week of the US Open is devoted to qualification matches; the second two weeks of the US Open are known as the "main draw." (Pls.' 56.1 ¶¶ 81-82). Each day, play begins at 11:00 a.m. and ends anytime between early evening and well past midnight, depending on the weather and the length of the matches being played. (Id. ¶ 79).

USTA obtains umpires to officiate matches at the US Open from national and international tennis organizations. (Def.'s 56.1 ¶ 33). Some umpires live in the United States

and are certified by the USTA. (Id. ¶ 34). The national tennis associations of other countries recommend other umpires. (Id. ¶ 35). Other tennis organizations supply still more umpires under agreements with the USTA. (Id. ¶ 36). The umpires fulfill several different roles. At smaller events, umpires serve as "roving officials" who oversee multiple matches and resolve disputes between players making their own line calls. (Id. ¶ 6). At larger events, umpires serve as chair or line umpires. (Id.). An official can work as both a chair umpire and a line umpire in the same tournament. (Pls.' 56.1 ¶ 91). Because tennis courts have ten lines, a "full crew" consists of the chair umpire and nine line umpires. (Id. ¶ 93). Not all matches require a "full crew."

Chair umpires preside over a match. (Def.'s 56.1 ¶ 9). Their decisions on "questions of fact" are final and non-reviewable—subject only to a limited number of challenges a player can exercise during each match to review line calls with the US Open's "Hawkeye" electronic line calling system. (Id. ¶¶ 9, 50). They must also decide "questions of law" during a match, such as whether a player's conduct merits a warning or a penalty. (Id. ¶ 51). Although usually applying a written rule, a chair umpire has "discretion" to decide "questions of law." (Pls.' 56.1 ¶¶ 98-99). At the request of a player, US Open referees—off-court officials—can hear appeals of a chair umpire's decision on a "question of law" but only rarely overturn the chair umpire's decision. (Id. ¶ 9; Def.'s 56.1 ¶ 53). A chair umpire may also decide to suspend a match because of weather conditions. (Def.'s 56.1 ¶ 52). Chair umpires officiate the entirety of the matches to which they are assigned. (Id. ¶ 54).

Line umpires make line calls and monitor player compliance with the rules of tennis, which they may report to the chair umpire. (Id. ¶ 7). Line umpires' decisions on "questions of fact," such as whether a ball is in or out, can only be overturned by the chair umpire. (Id. ¶ 8). Line umpires also have the discretion to decide whether to report a player's technical violation of

3

the rules of tennis, subject only to an even application of their decisions. (Id. ¶¶ 47-49). As line umpires, officials would work one-hour-on, one-hour-off at a specified court for all or part of the day. (Id. ¶ 46).

Umpires may pursue several levels of certification through various organizations. (Id. ¶ 11). USTA certifies officials as provisional, sectional, national, USTA, and professional. (Id. ¶ 12). Provisional umpires must pass a written test and meet visual acuity requirements. (Id.). An umpire may obtain subsequent USTA certification levels by officiating a certain number of matches and taking additional classes or certification tests. (Id.). Other tennis organizations have similar certifications. For example, the International Tennis Federation awards white, bronze, silver, and gold "badges" to officials who attend special training sessions and take the written examinations it offers. (Id.).

USTA-certified and international non-USTA-certified umpires who are recommended by their national organizations are eligible to officiate the US Open. (Id. ¶¶ 41-42; Pls.' 56.1 ¶ 105). A US Open selection committee reviews all applicants and identifies the most qualified umpires by examining their applications, certification levels, officiating experience, and performance at various tournaments throughout the year. (Def.'s 56.1 ¶ 43). The committee then sends acceptance and rejection letters to officials notifying them of its decision. (Id.). An individual selected to officiate at the US Open may accept or decline this offer. (Id. ¶ 44). If the individual chooses to accept, he or she must sign the "Official's Code of Conduct," which must be observed throughout the year. (Pls.' 56.1 ¶ 128). Among other things, the Code of Conduct prohibits socializing or becoming intimate with players; speaking to the media without permission; gambling on any tennis event; and conversing with spectators while on the court. (Id. ¶ 129).

USTA assigns umpires who accept their offer to officiate at specific matches at the US Open. (Def.'s 56.1 ¶ 55). Assignments are made based on a variety of factors, including the

4

official's badge or certification level and overall performance during the tournament. (Id.). To preserve the independence of officials, the USTA also ensures that chair umpires are not assigned to officiate matches involving a player of the same nationality, or where there is a history of disputes between the official and the player. (Id. ¶ 56).

USTA evaluates umpires at the US Open as well as at tennis events hosted by other organizations. (Pls.' 56.1 ¶ 132). These evaluations guide the USTA's decision to retain an umpire and to assign him or her to particular matches. (Id. ¶¶ 133-34). If the evaluations reveal a performance deficiency, the umpire may not be selected to officiate additional matches. (Id. ¶ 136). When a line umpire is evaluated, the evaluator examines the umpire's stance, walk, voice clarity, speed of decision, clarity of hand signals, etcetera. (Id. ¶ 139). Chair umpires are also evaluated. (Id. ¶ 141).

In their applications, umpires identify the days or weeks they are available to officiate matches. (Def.'s 56.1 ¶ 37). An umpire may limit his or her availability for personal or professional reasons. (Id. ¶ 39). The total number of days or matches that an umpire works depends on his or her availability and the needs of the US Open. (Id. ¶ 57). Nevertheless, umpires are required to travel to New York the day before the US Open begins, and may only leave after their assignment period ends. (Pls.' 56.1 ¶ 120). The number of hours an umpire spends on the court on any given day also varies. (Def.'s 56.1 ¶ 58). Umpires arrive at the National Tennis Center at their assigned check-in time, as early as 10 a.m., on days they are officiating, as required by Defendant; their departure time varies. (Id. ¶¶ 59-60). Typically, they spend approximately ten to eleven hours working at the US Open each day, including travel time, early arrival, downtime, and meal breaks. (Id. ¶ 60). Line umpires may leave the facility during their "off" times; chair umpires are generally required to remain close to the umpire's lounge so they can be located when they are needed. (Def.'s Resp. to Pl.'s 56.1 ¶¶ 111, 113).

Umpires selected to officiate the US Open sign independent contractor agreements with the USTA for each year they officiate. (Def.'s 56.1 ¶ 61). Each umpire is paid a fixed daily rate, between $115 and $200 per day, based upon his or her certification level. (Id. ¶¶ 62-63). For days they do not work at the US Open, the USTA pays umpires $40 per day. (Id. ¶ 62). The USTA also pays some travel, meal, and equipment costs for umpires—a stipend for airfare, hotel expenses at a designated hotel for a shared room, a nominal meal credit at the National Tennis Center, and cost of uniforms. (Id. ¶ 64). Umpires could, of course, pay to upgrade their travel, lodging, and meal arrangements. (Id. ¶ 65). Umpires also pay for other equipment necessary to their work as umpires, such as eyewear, sunblock, timer/watch, tape measure, etcetera. (Id. ¶ 66). Usually, umpires have reported income and expenses from officiating at the USTA as independent contractor income and expenses on their tax returns. (Id. ¶ 68).

## II. DISCUSSION

Defendant argues that it is entitled to summary judgment on Plaintiffs' claims for two reasons. (Def.'s Mem. Supp. Mot. Summ. J. 1-2, ECF No. 369). First, it says "plaintiffs are not entitled to overtime under [the FLSA or the NYLL] because they are independent contractors." (Def.'s Mem. Supp. 1). Second, it contends that even if Plaintiffs were deemed employees, "[P]laintiffs' claims are precluded under . . . provisions [of the FLSA and NYLL] that exempt from overtime requirements any employee that works for a 'recreation or amusement establishment' that takes in a substantial portion of its receipts during a six-month period." (Def.'s Mem. Supp. 2). Plaintiffs counter that USTA tennis umpires are employees of the USTA and are treated as such. (Pls.' Mem. Opp. Mot. Summ. J. 1-2). Nor does the USTA, which runs the U.S. Open, qualify for the "amusement or recreational establishment" exception. (Pls.' Mem. Opp. 2). The Court need not decide whether Defendant qualifies for the "amusement or

recreational establishment" exception because it finds that USTA's tennis umpires are independent contractors as a matter of law.

### A. Legal Standard

A party moving for summary judgment has the burden of establishing that no genuine issues of material fact exist, and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Scott v. Harris, 550 U.S. 372, 380 (2007); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003). Material facts are those that may affect the outcome of the case. Anderson, 477 U.S. at 248. An issue of fact is considered "genuine" when a reasonable finder of fact could render a verdict in favor of the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted).

In considering a summary judgment motion, "the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 11 (2d Cir. 1986) (citing Anderson, 477 U.S. at 248). If the court recognizes any material disputes of fact, summary judgment is improper, and the motion must be denied. Eastway Constr. Corp. v. City of N.Y., 762 F.2d 243, 249 (2d Cir. 1985).

If the moving party discharges its burden of proof under Rule 56(c), the non-moving party must then "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The non-moving party opposing a properly supported motion for summary judgment "may not rest upon mere allegations or denials of his pleading." Anderson, 477 U.S. at 256. Indeed, "the mere existence of some alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment, and "[i]f the evidence is merely

7

colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50. Rather, enough evidence must favor the non-moving party's case such that a jury could return a verdict in its favor. See Gallo v. Prudential Residential Servs., Ltd., 22 F.3d 1219, 1224 (2d Cir. 1999) ("When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper.").

### B. Employees versus Independent Contractors

Although this is an action to recover unpaid overtime, the crucial issue is whether Plaintiffs are properly classified under the FLSA and the NYLL as employees. See Browning v. Ceva Freight, LLC, 885 F. Supp. 2d 590, 597 (E.D.N.Y. 2012) (noting that only employees are covered by the FLSA and the NYLL; independent contractors are not). It is well established that in the absence of disputed issues of material fact, a court may determine plaintiffs' appropriate classification under the statutes as a matter of law. See Schwind v. EW & Assocs., Inc., 357 F. Supp. 2d 691, 701 (S.D.N.Y. 2005) ("[T]he existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law."); Sikorski v. Burroughs Drive Apartments, Inc., 762 N.Y.S.2d 718, 721 (App. Div. 2003) ("While the determination whether a worker is an employee or an independent contractor 'usually presents questions of fact sufficient to preclude summary judgment, where evidence is undisputed, and the facts are compellingly clear, the issue may be determined as a matter of law.'"). As is apparent from their Rule 56.1 statements, the parties do not dispute the material facts. Therefore, this motion presents a purely legal question and the Court may resolve it at the summary judgment stage. Given that the standards for determining employee status under the FLSA and the NYLL are similar but not identical, the Court will address each statute in turn.

1. **FLSA**

Under the FLSA, an "employee" is "any individual employed by an employer." 29 U.S.C. § 203(e)(1). To "employ" is "to suffer or permit to work." 29 U.S.C. § 203(g). "The definition is necessarily a broad one in accordance with the remedial purpose of the Act." Brock v. Superior Care, Inc., 840 F.2d 1054, 1058 (2d Cir. 1988).

In this Circuit, whether an employment relationship exists under the FLSA is determined by the "economic reality" of that relationship. Id. at 1058-59. Courts consider:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

Id. No one factor is dispositive; a court may consider any relevant evidence. Hart v. Rick's Cabaret Int'l, Inc., 967 F. Supp. 2d 901, 912 (S.D.N.Y. 2013). "[T]he test is based on a totality of the circumstances" analysis targeted at whether the "workers depend upon someone else's business for the opportunity to render service or are in business for themselves." Brock, 840 F.2d at 1059; see also Rutherford Food Corp. v. McComb, 331 U.S. 722, 730 (1947) ("[T]he determination of the relationship does not depend on such isolated factors but rather upon the circumstances of the whole activity."). Consequently, "the application of the economic realities test is inherently case-specific." Hart, 967 F. Supp. 2d at 912.

a. *Degree of Control*

"Though no single factor is dispositive, the 'greatest emphasis' should be placed on [this] factor—that is, on the extent to which the hiring party controls the 'manner and means' by which the worker completes his or her assigned tasks." Wadler v. Eastern College Athletic Conference, No. 00 Civ. 5671 (JSM), 2003 WL 21961119, at *2 (S.D.N.Y. Aug. 14, 2003). Plaintiffs urge that under the Wadler court's analysis, they qualify as employees of Defendant because

9

Defendant determined if they were retained, dictated what games they were assigned to, evaluated their performance, regulated their uniforms, and exerted control over compensation. (Pls.' Mem. Opp. 11-12). Defendants counter that umpires are properly classified as independent contractors because they had substantial discretion in the exercise of their duties and "call[ed] the game as [they] saw fit." (Def.'s Mem. Supp. 12).

Plaintiff's reliance on Wadler is easily dismissed. The Wadler court determined that an umpire was an independent contractor because he was not compensated by the organization he was suing. 2013 WL 21961119, at *3. The court noted that whether a worker received direct or indirect remuneration from the alleged employer is a key consideration in determining whether the worker was an employee. Id. at *2. Wadler, however, does not stand for the proposition that an organization's compensation of a worker creates a de facto employer-employee relationship. While the absence of remuneration categorizes the worker as an independent contractor, the converse is not true. The presence of remuneration is not dispositive.

The Court must still determine whether the degree of control that the USTA exerted over Plaintiffs was so high as to suggest an employer-employee relationship. Yonan v. U.S. Soccer Federation, Inc., 833 F. Supp. 2d 882 (N.D. Ill. 2011), is instructive. In Yonan, a soccer referee sued the Federation under the ADEA. Id. at 889. Because the ADEA only applies to employees, the court took on a similar analysis. Id. The court held that the Federation did not "closely supervise" the referee because "[h]e had full discretion and authority, under the Laws of the Game, to call the game as he saw fit." Id. (citations omitted). The court also found because the referee was free to work whichever days he wanted, could turn down assignments, and work as a referee for other organizations, he controlled the manner in which he performed his services. Id. at 890. Nor was the court convinced that the Federation's evaluative process was evidence of control. Id. at 889 ("There is no question that parties retaining independent contractors may

10

judge the performance of those contractors to determine if the contractual relationship should continue.").

Like in Yonan, Plaintiffs here "had full discretion and authority, under the Laws of the Game, to call the game as [they] saw fit." The parties agree that even as line umpires, they had the discretion to determine whether to report a player's technical infraction. Plaintiffs wielded even greater discretionary authority as chair umpires, even deciding whether to penalize a player for a rule violation. Simply having to officiate according to the rules of the game does not negate discretion.

Moreover, Plaintiffs decided whether to officiate at the US Open in a given year in the first instance. An umpire's selection process could not be initiated without an application from that umpire. In addition, if an umpire was selected to officiate, he or she was notified of his acceptance and was free to decline the post; umpires were free to officiate, and did officiate, at other non-USTA tennis tournaments; and umpires could determine which days to work at the US Open based on their personal and professional commitments. To be sure, USTA did have some degree of control over Plaintiffs (uniforms, best practices, evaluations, and code of conduct), but "the degree of control is not so great as to weigh in favor of finding the Plaintiffs to be employees as opposed to independent contractors." Browning, 885 F. Supp. 2d at 608.

### b. Worker's Opportunity for Profit/Loss

It cannot seriously be disputed that the USTA invested far more into the US Open than Plaintiffs did into officiating. Nevertheless, that does not end the Court's inquiry. The Court must also examine whether Plaintiffs could make a profit (or loss) umpiring for the USTA. Plaintiffs decided whether to invest in their skills as umpires by pursuing additional certifications, which lead to higher levels of compensation. Plaintiffs also decided whether to work at the US Open in any given year, and if so, how many days to work. These decisions

generated a profit for some Plaintiffs some of the years, and a loss for other Plaintiffs. This factor cuts both ways.

### c. Degree of Skill and Independent Initiative Required

"A position that requires special skills and independent judgment weights in favor of independent contractor status." Yonan, 833 F. Supp. 2d at 890. Plaintiffs' jobs as tennis umpires required a high degree of skill and independent initiative. Plaintiffs do not dispute this. To officiate for the USTA at the US Open, Plaintiffs had to have at least some level of certification. Opportunities for advancement came from Plaintiffs' taking initiative to officiate more games and get additional certifications. Although this factor is not alone indicative of independent contractor status, it weighs against an employer-employee relationship.

### d. Permanency and Duration of the Employment Relationship

Neither working multiple jobs, nor relying on sources other than the alleged employer as primary income require a finding of independent contractor status. Brock, 840 F.2d at 1060. Additionally, Plaintiffs argue that their relationship was not limited in duration because they were expected to abide by the USTA's Code of Conduct year round. However, the Court must focus on economic realities. Here, they suggest that Plaintiffs not only maintained other non-umpiring jobs, but were also free to serve as umpires for several different tennis associations. In fact, the evidence shows that they did do so. Moreover, umpires work at the US Open for a maximum of three weeks a year, and are not bound to return. Based on personal and professional considerations, they make an independent decision each year on whether to apply to officiate at the US Open. These facts demonstrate that both permanency and duration are limited in Plaintiffs' relationship with the USTA and weigh in favor of independent contractor status.

### e. Extent to Which Workers Are "Integral" to Employer's Business

There is no doubt that umpires are integral to the success of the US Open. Although Defendants suggest that professional tennis tournaments can be conducted without umpires, Plaintiffs note that no match has been played at the US Open without an umpire since at least 2005. This factor weighs in favor of an employer-employee relationship.

### f. *All Factors*

Examining these factors together in the context of the economic realities test, reveals that Plaintiffs were independent contractors, not employees. When examined under a totality of the circumstances, it is obvious that Plaintiffs are in business for themselves; they do not "depend upon [Defendant] for the opportunity to render service." Brock, 840 F.2d at 1059. In their roles as umpires, Plaintiffs are highly skilled professionals who exert a high degree of control over their work. They have immense discretion, within the parameters of the rules of tennis, to conduct their duties—whether it be to suspend play or to report or penalize a player for a rules infraction. They invest in themselves as professional umpires by pursuing additional certifications and officiating other tournaments. They control their own schedules, and even decide annually whether to apply to officiate for the US Open. Their association with USTA may recur annually, but the duration of their relationship is short-lived. In addition, it merits at least some consideration that Plaintiffs choose, year after year, to report their umpiring income as independent contractors, not employees. Even though the umpires' integral role in the US Open weighs towards a finding of an employer-employee relationship, the totality of the circumstances suggest otherwise. Plaintiffs are independent contractors for the purposes of the FLSA.

### 2. NYLL

The NYLL was enacted to protect employees. "'Employee' is defined nearly identically (and with equal circularity) in the FLSA and NYLL." Hart, 967 F. Supp. 2d at 923 (comparing 29 U.S.C. § 203(e)(1) ("[T]he term 'employee' means any individual employed by an

13

employer."), with NY Lab. Law § 190(2) ("'Employee' means any person employed for hire by an employer in any employment.")). Therefore "the standard for determining a worker's status as an employee or independent contractor under New York State Labor Law is similar [to the FLSA inquiry], and accounts for some of the same factors." Velu v. Velocity Express, Inc., 666 F. Supp. 2d 300, 306-07 (E.D.N.Y. 2009).

"[T]he critical inquiry in determining whether an employment relationship exists [still] pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." Bynog v. Cipriani Grp., Inc., 1 N.Y.3d 193, 198 (2003). The additional factors considered under the NYLL to determine control are whether plaintiffs (1) worked at their own convenience; (2) were free to engage in other employment; (3) received fringe benefits; (4) were on the employer's payroll; (5) were on a fixed schedule, and (6) claimed independent contractor status on their tax returns. Id. "[T]he manner in which the [plaintiff treats the relationship] for income tax purposes is . . . a significant consideration, [but] it is generally not singularly dispositive." Gagen v. Kipany Prods., Ltd., 812 N.Y.S.2d 689, 691 (N.Y. App. Div. 2006). Like the economic realities test, the NYLL test examines the totality of the circumstances and no one factor is determinative as to the ultimate question of control. Perfect Dental, PLLC v. Allstate Ins. Co., 538 F. Supp. 2d 543, 547 (E.D.N.Y. 2007).

"Notwithstanding the separate NYLL inquiry, . . . '[t]here is general support for giving FLSA and the New York Labor Law consistent interpretations.'" Hart, 967 F. Supp. 2d at 924 (citations omitted). "[T]here appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)." Id.

In addition to the Court's analysis on control above, the Bynog factors also support a finding that Plaintiffs were independent contractors. As discussed above, Plaintiffs worked at their convenience—they decided whether to apply to officiate at the US Open, they identified

14

their availability, and after the USTA notified them of their acceptance, they chose to accept a position officiating tennis matches at the US Open. Plaintiffs were also free to engage in other employment as is evidenced by the fact that while they officiated for the USTA, many of them held jobs unrelated to tennis, and freely officiated at other non-USTA tournaments. Plaintiffs did not receive fringe benefits from the USTA; nor were they on the USTA's payroll. Plaintiffs were simply temporary workers paid by the USTA. Plaintiffs also generally claimed independent contractor status on their income tax returns. When the totality of circumstances are examined, there is no doubt that Plaintiffs were independent contractors for purposes of the New York Labor Law and are not entitled to its protections.

### III. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (ECF No. 364) is GRANTED, and Plaintiff's Cross-Motion for Summary Judgment (ECF No. 380) is DENIED. The Clerk of Court is respectfully requested to enter judgment for Defendant and to close this case.

**SO ORDERED.**

Dated: September 11, 2014
New York, New York

_____
**ANDREW L. CARTER, JR.**
**United States District Judge**